Mrs. Norman Perret, while a passenger in a taxicab of Toye Bros. Yellow Cab Company, a partnership, sustained personal injuries as a result of a collision at the corner of Dryades and Poydras Streets in New Orleans, between the taxicab in which she was riding and a Chevrolet sedan owned and driven by Louis Marcomb.
Mrs. Perret and her husband bring this suit against the said partnership and the said Marcomb alleging that the accident was caused by the joint negligence of the operators of the two automobiles. They ask for solidary judgment against the partnership and Marcomb. Mr. Perret seeks recovery of $573.91 for medical costs, drug bills and other expenses borne by the community as a result of the injuries to Mrs. Perret and Mrs. Perret, on her own behalf, prays for judgment for $10,000 for pain, suffering and permanent injuries alleged to have been sustained by her.
The defendants admit the occurrence of the accident and each charges that the negligence of the operator of the other *Page 836 
automobile was responsible for the collision. Both maintain that the injuries of Mrs. Perret are not nearly so serious as is alleged by plaintiffs.
There was judgment against both defendants solidarily in favor of Mr. Perret for $256.91 and in favor of Mrs. Perret for $2,500. Both defendants have appealed and both plaintiffs have answered the appeals praying that the awards be increased to the amounts respectively prayed for by them in their petition.
The accident took place at about 9 o'clock in the morning on November 20th, 1939. The weather was clear and the streets were dry. Poydras Street is a very wide, double driveway thoroughfare with a neutral ground between the two driveways. This neutral ground is 15 feet in width. Each of the driveways is about 46 feet wide. Dryades Street is a one-way street to be used by vehicles going in an upper direction only. It is 22 feet, 2 inches in width and crosses Poydras at a right angle. On the two ends of the neutral ground at Dryades Street there are automatic electric semiphore traffic lights by which traffic is controlled. These lights were operating perfectly at the time of the accident.
The taxicab, driven by Ernest Rodelliat, an employee of the Toye Bros. partnership and occupied by Mrs. Perret, was on its way up Dryades Street and the Chevrolet, driven by Marcomb, was on Poydras Street. With Marcomb was a friend who, since the accident, has died of natural causes and could not be produced as a witness. Marcomb, who, as we have said, was on Poydras Street, was going towards Lake Pontchartrain, but before he reached Dryades Street he realized that he had forgotten to get certain material which he needed in his trade and which was in an establishment on Magazine Street a few city blocks to his rear. He decided to make a "U" turn to his left around the end of the neutral ground at Dryades Street, and to go back on the upper side of Poydras Street to Magazine Street. This maneuver is not prohibited by the traffic ordinance of the City. In doing this it was necessary for Marcomb to wait at Dryades Street for a red light as the traffic regulations require that a vehicle turning to the left on Poydras Street, at the corner of Dryades Street, shall do so only when the light is red to Poydras Street traffic and green towards traffic on Dryades Street. For this reason, when the light changed, Marcomb was permitted to make the turn and the same light permitted the taxicab to proceed across Poydras Street, and thus to pass between the same two ends of the neutral ground between which Marcomb desired to pass. In other words, the two vehicles were crossing on the same favorable light and at the same time. They came into contact and Mrs. Perret, the passenger in the cab, was hurt.
It is obvious that Mr. and Mrs. Perret must recover from either or both of the defendants and it is equally clear that since she was a passenger for hire, so far as the claim against Toye Bros. is concerned, the burden is on that defendant to show that it was free from fault. See Cusimano v. New Orleans Public Service, Inc., 170 La. 95, 127 So. 376.
The case thus resolves itself into a contest between the two defendants, each attempting to avoid liability by saying that the entire fault lies with the other. Toye Bros. maintains that Marcomb attempted to make the "U" turn to his left at too high a speed, and without keeping a proper lookout, and that as a result he swung out too far to his right and hit the taxicab, which had already entered the intersection, whereas Marcomb contends that he made the turn to his left at a very slow speed, and that at no time did his car extend more than 7 feet into Dryades Street, and that ample room was left to his right for the taxicab to negotiate the crossing but that the driver of the cab entered the intersection at a speed of about 30 miles or more per hour, and instead of keeping to his right, allowed the cab to go too far to the left, with the result that it struck, or was struck by, the Marcomb car before that car could be stopped.
Mrs. Perret said that as the car entered the intersection: "I had my head down, looking at something in my purse," and she gave this as her reason for not having seen the Marcomb car. She said that she knew very little about the accident. It is shown that shortly after the accident, at the solicitation of an adjuster of Toye Bros., she had signed a written statement in which she had exonerated the driver of the cab from all blame and had said she had seen the Marcomb car and that "it seemed to be travelling at a good rate of speed" and that "it made too wide a turn * * * and ran into the left side of my cab." Counsel for Marcomb objected to the introduction of this statement insofar *Page 837 
as it might have any effect against Marcomb, and, of course, this objection was well founded. Anything contained in that ex parte statement could not be used against Marcomb.
After the accident, the Marcomb car is shown to have been stopped in the intersection and the Yellow cab is shown to have proceeded across the other side of Poydras Street and to have come to a stop after entering Dryades Street.
Rodelliat, the driver of the taxicab, apparently did not see the Marcomb car as it was about to enter the intersection and turn to its left because he admitted that he had seen several cars on Poydras Street which were stopped because of the light, and that as he, himself, attempted to cross Poydras Street: "I noticed this car coming out Poydras Street." It seems clear that these other cars which Rodelliat saw standing on Poydras Street were in the center line of traffic, away from the neutral ground, and that Marcomb passed between them and the neutral ground and was thus screened by them from Rodelliat's view.
There is some evidence to the effect that the taxicab, instead of keeping to the right on Dryades Street, had found it necessary to go a little bit to the left in order to pass cars which were parked at the curb on Dryades Street.
A very careful reading of the record leaves us utterly unable to reach an independent conclusion concerning fault, and if we did not have the benefit of the finding of the District Judge we would have great difficulty in rendering a decree. We find no physical facts which conclusively indicate where the blame should be placed. There was ample space between the ends of the neutral ground (25 feet) for both vehicles to proceed had both drivers been careful.
To the right of Marcomb, as we have said, were other cars which partially screened his car from the view of Rodelliat. It may well be that due to this, Rodelliat did not see the Marcomb car and drove too far to his left. On the other hand, there were other vehicles ahead of the Yellow cab which had already crossed the intersection, and it may be that Marcomb, seeing them pass, reached the conclusion that there were no other vehicles coming and that he could turn to his left, and need not stay too close to the end of the neutral ground. It is true that he saw the Yellow cab, and that he says when he was 15 feet from the crossing the cab was still 10 feet from the property line of Poydras Street. If this is true, surely he would not have swung too far to the right. However, as we have said, from the facts presented the record does not conclusively indicate which of the two drivers was at fault and all that we can say positively is what may be said of every intersectional collision, that if both drivers had been careful there would have been no accident. In such a case as this, we must rely very much upon the fact that the District Judge saw and heard the witnesses and based his conclusion on the demeanor and actions of the witnesses on the stand. It would be safer to follow his conclusions than to reach independent ones from a reading of the written record.
We thus find it necessary to discuss the injuries sustained by Mrs. Perret and to determine just how much she should be awarded for those injuries, and also to consider the amount awarded to Mr. Perret to compensate him for expenditures for medical, drug and other such bills.
Mrs. Perret was 41 years old. In her petition she described her injuries as follows: "an incomplete fracture of the left shoulder, just behind the glenoid; contusions and brush burns on the left leg and left side of the head and a severe shock to the nervous system." She says that she was under the care of a physician for eleven weeks.
It may be well to mention here that the principal complaint now made is that she suffers from Meniere's Disease, and yet strangely enough, this particular complaint is not mentioned in her petition, though she does say "that the injury to her head caused her to suffer continually with her left ear and that she still suffers with that ear."
Dr. Godchaux, her regular family physician, because of his own physical condition, could not treat her until three days after the accident, and when he did, he found that she was suffering from severe pains in her left shoulder and that he could feel "crepetation" of the shoulder joint, and that this led him to believe that she had an intracapsular fracture in the soft parts of the joint. He also said that she sustained a bruise on her left leg and a hematoma or blood tumor over her left ear. He added that she complained very much of pains in the head. He treated her until about the middle of March, and then advised *Page 838 
that, since she was not being improved to his satisfaction, she consult other doctors.
He found that she was suffering from Meniere's Disease, the principal symptoms of which he said were immediate dizziness, vertigo, vomiting and prostration. He said that she had suffered from this particular disease about a year prior to the accident, but apparently had overcome the effects of it. Mrs. Perret says that she had had an attack of Meniere's Disease about a year before the accident, but that at the time of the accident, so far as that disease was concerned, "she considered herself practically normal." She claims that as a result of the accident there was a reactivation of the disease and she says: "I can hardly hear today with that ear, and it still hisses, and I do have attacks."
Dr. Maurer, who treated her for the injury to her shoulder, said that she had not fully recovered and that though the symptoms were "subjective" she still has minor aches and pains there.
Dr. Weinberger, an expert in the treatment of internal conditions as well as in the treatment of Meniere's Disease, states that she had called to see him on September 20th, 1938, which was a little more than a year prior to the accident, and that he had diagnosed her trouble as Meniere's Disease, and that he had treated her for a few weeks. He made the following statement concerning Meniere's Disease: "Meniere's disease is a disease which is associated with any disturbance in the middle ear that brings about consequent disturbance in the vestibular nerve, which is the nerve that controls equilibrium. Meniere first described so-called Meniere's disease. It was known as a simple effusion into the middle ear, but we, to-day, have gone further than that. We have considered many causes for a disturbance to the vestibular nerve, namely, infection anywhere in the body which can produce it; second, toxic causes, such as intestinal disturbances or other severe illnesses that may produce a toxemia; third, arteriosclerosis; fourth, I will add a pseudo condition which is known as neurosis which can produce a condition which simulates Meniere's disease. The fifth cause, and which is the most prominent, is a true infection in the ear, nose and throat system, namely, a block of the eustachian tube, which produces a retraction of the drum. This brings about a lack of aeration which, in turn, brings about a disturbance of the vestibular nerve. The condition has a tendency to recur, because our treatment of the condition has been very faulty — I might interpolate, until recently."
As to whether she had been cured of this first attack, he said that it was quite possible that where one suffering with the disease showed such improvement as Mrs. Perret showed, there might be no recurrence. Dr. Weinberger also said that a recurrence or a reactivation might be caused by trauma. He was asked if, under such circumstances as this case disclosed, where a patient has suffered from Meniere's Disease and has gotten as much better as Mrs. Perret got, and has then had an accident and then a recurrence, he would consider the recurrence a mere coincidence, and he answered: "I certainly wouldn't consider it a coincidence if the patient was in an accident and came out suffering."
There is much evidence by other eminent surgeons and physicians to the effect that there is always danger of recurrence where one has once suffered from Meniere's Disease, and there is evidence to the effect that probably a recurrence will not be caused by trauma. We cannot avoid the conclusion that in this instance the accident was responsible for the reactivation of the disease.
In view of what all of the doctors say about Meniere's Disease, and in view of the other injuries which Mrs. Perret undoubtedly sustained, the amount awarded below is not excessive.
When we come to consider the claim of Mr. Perret, we have some doubt as to whether he has proven all the items claimed, but we think that the record warrants the conclusion that he has proven as much as was awarded him below, to-wit, $256.91.
For these reasons, the judgment appealed from is affirmed at the cost of appellants.
Affirmed. *Page 839