14 N.J. Super. 277 (1951)
81 A.2d 811
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
SAMUEL GOOZE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 4, 1951.
Decided June 21, 1951.
*280 Before Judges EASTWOOD, BIGELOW and FREUND.
Mr. Paul T. Huckin argued the cause for the plaintiff-respondent (Mr. Francis V.D. Lloyd, attorney).
Mr. Albert S. Gross argued the cause for the defendant-appellant.
The opinion of the court was delivered by EASTWOOD, J.A.D.
The question raised by this appeal is whether a person knowingly suffering from a disease, the manifestations of which may recur at any time and cause a sudden "black out" or unconsciousness, may be amenable to the provisions of R.S. 2:138-9. The statute for the violation of which the defendant was indicted provides:
"Any person who shall cause the death of another by driving any vehicle carelessly and heedlessly in willful or wanton disregard of the rights or safety of others shall be guilty of a misdemeanor; but it shall be unlawful to use or offer in evidence the record of any judgment or conviction obtained hereunder in any civil action brought to recover damages arising out of the accident in which such death occurred."
He waived a trial by jury and was found guilty by the Bergen County Court, Law Division, on January 26, 1951, from which judgment of conviction he appeals.
A summary of the evidence reveals that: On July 1, 1950, the defendant was driving a Cadillac car at a speed of approximately 40 miles per hour in a southerly direction on Route 9-W. One Carl W. Larsen, who was driving his automobile *281 in the opposite direction, testified that when he was about two miles north of Tenafly he saw the approaching car of the defendant with apparently no driver at the wheel; that the defendant's car crossed the white line separating the lanes approximately 240 to 300 feet to the north of Larsen's car, whereupon Larsen swung sharply to his right, but the defendant's car struck Larsen's car in the left rear portion thereof; that the defendant's car continued in the same direction and crashed head-on into a Studebaker automobile approximately 40 feet in the rear of the Larsen car; that the latter collision caused the death of Glory Morrow Flobeck. When Mr. Larsen reached the defendant's car, he found that he had collapsed at the wheel and was in a semiconscious condition, so that it was necessary to assist him from the car; the defendant stated he had "blacked out," whereupon he collapsed and was taken to a hospital in an ambulance. It is conceded that defendant was not under the influence of intoxicating liquor nor was there any evidence thereof upon his person. In late February, 1949, the defendant, while at home, suffered a sudden attack of dizziness or unconsciousness; subsequent thereto he was treated by his family physician and shortly thereafter by one Dr. Moses Madonick, Assistant Professor of Clinical Neurology in the College of Physicians and Surgeons, Columbia University, who diagnosed the defendant's condition as Meniere's Syndrome. After treating him on two or three occasions, Dr. Madonick discharged him on July 26, 1949, advising him that he might suffer a recurrence of the disease and that if he should drive an automobile he should not drive alone, but someone should accompany him. The defendant testified that he remembers nothing about the accident; that immediately prior thereto he was proceeding at 35 to 40 miles per hour when all of a sudden he just "blacked out" and remembered nothing until he came out of the "black out" in the hospital. Dr. Madonick testified further that he examined the defendant after the accident on August 2, 1950, at which time he concluded there was a recurrence of *282 the ailment and that in his opinion it was the cause of the defendant's "black out" or loss of consciousness without warning on the date of the accident.
The only ground of appeal argued by the defendant is "The proofs do not support the conviction for violation of R.S. 2:138-9."
At the outset, it might be well to state the rule of law generally applicable to the case that presently demands our consideration. Generally, the negligence required to support a criminal charge for a death caused thereby is more than ordinary common law negligence and is something more and greater in degree than negligence to impose civil liability. 61 C.J.S., Motor Vehicles, sec. 659, pp. 771, 773, citing State v. Blaine, 104 N.J.L. 325 (E. & A. 1928). See also State v. Schutte, 87 N.J.L. 15 (Sup. Ct. 1915); affirmed 88 N.J.L. 396 (E. & A. 1916). "In this second class of cases the rule is a broad one, as it regards as criminal negligence any act or omission done or left undone, as the case may be, in reckless disregard of the life or safety of another. State v. O'Brien, 32 N.J.L. (at p. 172); State v. Reitze, 86 Id. 407, 409; 29 C.J. 1154. Such negligence is often described as `gross' negligence, the word `gross' in this collocation implying an indifference to consequences. Whart. Hom. (3d ed.), p. 681; 29 C.J. 1154, note 96 (c)." State v. Blaine, supra. "The statute [in question] according to its plain words, makes the act of operating a motor vehicle on a way `so that the lives or safety of the public might be endangered' a criminal offense. It is that act which is penalized. The intent with which the act is done is an immaterial factor." Commonwealth v. Pentz, 247 Mass. 500, 143 N.E. 322 (Sup. Jud. Ct. 1924), cf. Iaconio v. D'Angelo, 104 N.J.L. 506 (E. & A. 1928). Gross negligence includes a "wanton or reckless disregard of the rights and safety of others." State v. Linarducci, 122 N.J.L. 137 (Sup. Ct. 1939); State v. Blaine, supra. "To establish a willful or wanton injury it is necessary to show that one with knowledge of existing conditions, and conscious from such *283 knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result. 29 Cyc. 509." Staub v. Public Service Railway Co., 97 N.J.L. 297 (E. & A. 1922); Iaconio v. D'Angelo, supra. Our courts make a distinction between gross negligence and willful and wanton disregard of the rights and safety of others. To constitute willfulness, there must be design, purpose, intent to do wrong and inflict injury. To constitute wantonness, the party doing the act, or failing to act, must be conscious of his conduct, and, without having the intent to injure, must be conscious, from his knowledge of existing circumstances and conditions that his conduct will naturally and probably result in injury. Eatley v. Mayer, 9 N.J. Misc. 918 (Cir. Ct. 1931); affirmed, Eatley v. Mayer, 10 N.J. Misc. 219 (Sup. Ct. 1932). To constitute willful or wanton misconduct, the wrongful act willfully done must be "of such a nature that the injury complained of is the obviously natural result to be expected therefrom. This is so because the law presumes that a wrongdoer intends what he knows, or should know, to be the natural consequence of his wrongful act." Rose v. Squires, 101 N.J.L. 438 (Sup. Ct. 1925); affirmed 102 N.J.L. 449 (E. & A. 1926). "* * * it is clear as is said by Dr. Wharton, in his work on Criminal Law (section 1003), that where death is the result of an occurrence unanticipated by the defendant, but which arose from his negligence or inattention, his criminal responsibility depends on whether or not the injury which caused the death was the regular, natural and likely consequence of defendant's conduct. If it was, then the defendant is subject to indictment. If it was not, he cannot be properly charged with a penal offense." State v. Reitze, 86 N.J.L. 407 (Sup. Ct. 1914). Cf. State v. Hedinger, 126 N.J.L. 288 (Sup. Ct. 1941).
The circumstances of this case are quite unusual. According to Dr. Madonick, the defendant's specialist, the condition *284 suffered by the defendant was characterized as Meniere's Syndrome, which Dr. Madonick described as: "It is a term applied to a disturbance in equilibrium, and it usually is the result of a malfunction of the three semicircular canals in the inner ear, and there is a disturbance in their function at that particular time"; it demonstrates itself "by attacks of dizziness, disturbance in gait; sometimes they walk like they are wobbly; sometimes they look like they are drunk * * * the chief complaint is dizziness, where the room spins around, objective vertigo." A quotation of Dr. Madonick's testimony will more clearly indicate the knowledge acquired by the defendant of the seriousness of his disease and probability of recurring attacks, viz.:
Mr. Eisenstein:
"Q. Doctor, in your opinion, I assume, sir, that you have considered the driving of an automobile by a person suffering from this type of disease and the possibility of recurrence of it, somewhat as a dangerous operation? A. Yes.
Q. No question about that, is there, Doctor? Because this man had this type of disease which occurred even after being discharged, in the fashion you have indicated, some weeks or months or years later, he can go behind the wheel and black-out and kill somebody. Isn't that correct? A. That is correct.
Q. And you have warned him about that? You told him not to drive an automobile. Isn't that correct, sir? A. I told him to be very careful.
Q. Yes.
The Court: Was that in response to the question, you warned him not to drive an automobile?
The Witness: No. I didn't tell him that he has to stop. I told him to be very careful if he does drive.
The Court: What do you mean by that?
The Witness: I mean somebody ought to be present, if it is possible, and sitting next to him.
Q. Did you so inform him? A. Yes.
Q. All right. Did you also tell him, Doctor, that while you were discharging him, it was no assurance that he would not have a recurrence of this attack and, if he should drive an automobile, he is liable to have an attack and pass out? Did you tell him that?
A. Yes.
Q. You did tell him that? A. Yes."
The Court:
"Q. Doctor, I thought you said, when I asked you about that very situation that you told him he should be very careful. And *285 I asked you what did you mean, and you said  well, I thought you said you instructed him not to drive alone but have someone with him? A. Yes. But I did not tell him that he has to give up driving entirely.
Q. Yes. But did you tell him that, when he entered an automobile to drive it, he should have someone with him? A. Yes.
Q. You told him that? A. Yes, that is right.
Q. And when did you tell him that? A. That was after I had seen him on July 26th.
Q. On July 26th, before you discharged him? A. That is right.
Q. Is that correct? A. That is correct."
Dr. Roscoe N. Gray, in his Attorneys' Textbook of Medicine (3d ed.), vol. 2, 100.23, discussing epilepsy, states:
"Meniere's disease is an inflammatory process involving the semicircular canals of the ear, which have to do with knowledge of our position in space. Thus dizziness is a cardinal symptom. Because there may be instability during the period of unconsciousness in petit mal epilepsy, many of these people say that they have been dizzy. However, unconsciousness is not found in attacks of Meniere's disease."
Webster's New International Dictionary (2d ed.), defines syndrome as follows: "Concurrence; a set of concurrent things"; medically "a group of signs and symptoms that occur together, and characterize a disease."
The defendant contends that under the circumstances here, there was no proof that the defendant operated his automobile carelessly and heedlessly and with willful or wanton disregard of the rights or safety of others; that to have warranted his conviction the State had the burden of proving that he was conscious of his conduct and that the death caused thereby was the natural or probable result that he should have foreseen and contemplated; that, as a matter of fact, the accident was caused by his "black out" resulting from an unexpected recurrence of Meniere's Syndrome and that having no other recurrence thereof since he was discharged by Dr. Madonick in July, 1949, there was no reason why he should not have undertaken the operation of his automobile on the day in question. We disagree with this contention. *286 In driving his automobile alone on a through-state highway with knowledge that he might at any time suddenly, without warning, lose consciousness or suffer a dizzy spell, and having been cautioned not to drive alone, constituted an act of wantonness and a disregard of the rights or safety of others. It was reasonably foreseeable that if he "blacked out" or became dizzy without warning, its probable consequences might well be injury or death to others. The industry of counsel has not furnished nor have we been able to find a decided case altogether parallel to that under review. Probably the nearest approach are the cases that deal with one operating a car while asleep or suffering from epilepsy. It has been held that one operating an automobile, knowing that he has been without sleep for an unusual period of time and becoming conscious of a sensation of drowsiness, yet continues to drive and then falls asleep, as the result of which his car gets out of control, thereby causing serious injury or death to others lawfully using the highway, may be guilty of violating a criminal statute prohibiting reckless and careless operation of an automobile on a public highway in willful or wanton disregard of the safety of others. "The burden of the foregoing authorities is overwhelmingly that the fact of going to sleep at the wheel of an automobile, without more, at least presents a question for the jury as to whether the driver was negligent. We think this a sound and salutary rule, for while one cannot be liable for what he does during the unconsciousness of sleep, he is responsible for allowing himself to go to sleep  to get into a condition where the accident could happen without his being aware of it, or able to avoid it. Bushnell v. Bushnell, supra. We think the jury could find such conduct to be negligence manifesting a marked disregard for the safety of others on the highway." State v. Olsen, 160 P.2d 427, 160 A.L.R. 508 (Utah Sup. Ct. 1945). Cf. People v. Robinson, 253 Mich. 507, 235 N.W. 236, 160 A.L.R. 515 (1931); Johnson v. State, 148 Fla. 510, 4 So.2d 671, 160 A.L.R. 516 (1941). With respect to an epileptic, in Commonwealth v. *287 Irwin, 345 Pa. 504 (Sup. Ct. Pa. 1942), the Supreme Court said:
"There will, no doubt, be common agreement that a person afflicted with epilepsy is `incompetent or unable to exercise reasonable and ordinary control over a vehicle' on the public highway."
While this was an appeal from an order requiring the issuance of a driver's license, there seems to be little doubt that the court was of the opinion that because of the foreseeable danger to others lawfully using the highways, a person who was subject to an epileptic attack should not be permitted to drive an automobile. See also People v. Freeman, 61 Cal. App.2d 110, 142 P.2d 435 (D.C. of App., 2d Dist. Cal. 1943), where the appellate court reversed the conviction of the defendant for negligent homicide, holding that to sustain the conviction the motorist must have been shown to have driven with a reckless disregard of or willful indifference to the safety of others which is the intentional doing of an act with a wanton and reckless disregard of the possible result. The defendant, an epileptic, feeling ill at a friend's house, had been given two drinks of whiskey and then left to drive home saying he "thought he could make it." The court reversed the conviction on the ground that the trial judge should have submitted to the jury the question of whether defendant at the time of setting out in his car had a present consciousness of his former sufferings and had the normal powers of his will, or, in other words, had such control of his mental processes as to make an intelligent decision about driving after weighing all the circumstances and possible consequences.
In Tift v. State, 17 Ga. App. 663, 88 S.E. 41 (Ct. of App., Ga., 1916), the court approved the following instructions to the jury:
"If, however, you find beyond a reasonable doubt that at the time of said collision and injuries the defendant was subject to frequent attacks of vertigo or similar afflictions which, when they came on, necessarily rendered him powerless to control a moving automobile *288 that he might at the time be driving, and that, with full knowledge that he was subject to such attacks and the effect of such attacks, defendant was intentionally running said automobile at a rate of speed so high as to obviously make said machine dangerous to others traveling in vehicles upon said highway, and while thus running said car defendant suffered a customary attack of such malady, which rendered him powerless to control said car, whereby said collision occurred, resulting in such injuries, the collision would not be attributable to misfortune or accident, but defendant would be guilty of the offense of an assault and battery."
It is a principle of law well established that an automobile is not inherently a dangerous instrumentality. 5 Am. Jur., Automobiles, sec. 11, p. 522; Stevenson's Negligence Law in New Jersey, sec. 1, c. 1, p. 43; Wilson v. Brauer, 97 N.J.L. 482 (E. & A. 1922); Sheridan v. Arrow Sanitary Laundry Co., 105 N.J.L. 608 (E. & A. 1929). When carefully handled, it is not dangerous either to its passengers or to other persons using the public highway who are themselves in the exercise of reasonable care. Its great capacity and power endow it with dangerous possibilities, but human agency  wanton or negligent agency  must call them into play. As was stated in Lewis v. Amorous, 3 Ga. App. 50, 59 S.E. 338 (1907): "It is not the ferocity of automobiles that is to be feared, but the ferocity of those who drive them. Until human agency intervenes, they are usually harmless." However, it is an instrumentality that is potentially dangerous when under the control of a careless, reckless or incompetent operator. Trussell v. Gibson, 11 N.J. Misc. 481 (Sup. Ct. 1933); Wilson v. Brauer, supra; Sheridan v. Arrow Sanitary Laundry Co., supra. A recognition of the potential danger and hazard created by the operation of an automobile in the hands of a reckless, careless or incompetent operator undoubtedly prompted the Legislature to enact the statute in question as a means of eliminating or at least averting, so far as possible, the mounting number of persons seriously injured and killed almost daily, in many instances by such careless, reckless or incompetent driving, without any consideration for the rights or safety of others lawfully entitled *289 to share the use of the highway. Under all the circumstances here, we are convinced that the defendant was fully aware of the disease of which he was suffering; that he was specifically warned by Dr. Madonick that he might suffer a recurrence or suddenly "black out" or become unconscious and, therefore, should be careful about driving alone; that in the face of this knowledge of his disease and the danger of a recurrence, he deliberately got behind the wheel of an automobile and operated it upon a very busy highway when a recurring attack occurred, causing him to lose control of his automobile and to crash into other automobiles and to destroy, tragically and unfortunately, the life of the operator of one of the cars. We think the facts clearly bring the defendant's conduct within the condemnation of the statute in question. There was sufficient evidence to sustain the judgment of conviction and, therefore, it will not be disturbed. State v. Nolan, 1 N.J. Super. 280 (App. Div. 1949).
The judgment of conviction is affirmed.
BIGELOW, J.A.D. (dissenting).
In my opinion, the appellant was not guilty of the crime charged unless, as he drove along the highway on July 1, 1950, the day of the fatal accident, or as he took out his car that day, he was then conscious that injury to someone else would likely or probably result from his operation of the automobile.
On July 29, 1949, nearly a year before the accident, Dr. Madonick had told appellant that he had a disease called Meniere's Syndrome, as a result of which he might lose consciousness at any moment, and "that he should be very careful and have someone with him whenever he drove an automobile." The appellant, after being confined to his home for four or five weeks in February and March, 1949, had already resumed his regular work as foreman in a trucking office. After the final check-up with the doctor on July 29, he continued to work as usual. Then, on July 1, 1950, came the sudden renewal of the attack  a moment of nausea and immediately unconsciousness.
*290 This evidence does not, I submit, warrant an inference that appellant, on July 1, 1950, was aware of the danger. If he had had his earlier attack, or the warning from the physician, only a month or so before the accident, the inference might be permissible. But the time which actually had elapsed was too great. Note that he had been pursuing his ordinary occupations one year and three months without any recurrence of the attack. Indeed, the court did not find that appellant was alive to the danger. The court only found him guilty of gross negligence. "I find that his negligence was culpable and that he is guilty of the crime of manslaughter." That was not the crime of which he stood accused.
The judgment ought to be reversed and a judgment of acquittal entered.