Clarence L. HAWKINS, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of
Health, Education and Welfare,
Defendant.

Civ. A. No. 818.

United States District Court
W. D. Arkansas,
Texarkana Division.

Nov. 21, 1962.

Atchley, Russell, Hutchinson & Waldrop, Texarkana, Tex., for plaintiff.

Charles M. Conway, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

This is an action by the plaintiff, Clarence L. Hawkins, to review a final decision of the defendant Secretary, denying the plaintiff's application for a period of disability and disability benefits as authorized by the Social Security Act, as amended, 42 U.S.C.A. §§ 416(i) (1), 423. This court has jurisdiction of the action pursuant to Sec. 205(g) of the Social Security Act, 42 U.S.C.A. § 405(g).

On September 26, 1960, plaintiff filed his application to establish a period of disability and his application for receipt of disability insurance benefits. The applications were subsequently denied, and the plaintiff thereafter requested a reconsideration of said denial. Upon reconsideration the Bureau of Old-Age and Survivors Insurance affirmed the denial of the applications, and the plaintiff thereafter requested a hearing before a hearing examiner. The hearing was conducted on November 16, 1961, and on November 30, 1961, the hearing examiner filed his decision denying the plaintiff's claim. Thereafter the plaintiff requested the Appeals Council to review the hearing examiner's decision, and on March 5, 1962, the Appeals Council denied plaintiff's request for review. The decision of the hearing examiner therefore became the final decision of the defendant Secretary.

The plaintiff filed the instant action on May 3, 1962, and in due time the defendant filed his answer. The case is now before the court on cross motions for summary judgment. Briefs have been received from both sides in support of their respective contentions and have been considered by the court.

The pertinent facts in this case are not in dispute. The plaintiff was born February 16, 1921, at Fouke, Arkansas. His formal education consisted of completion of the eighth grade. During his work history he has received special training and acquired skill as a meat cutter. He was first employed on a farm until he was 17 or 18 years old. He then worked in a planer mill where he drove a truck, ran a planer and stacked lumber for a period of about 18 months. In 1942 he was inducted into the U. S. Army, and he pursued this military career until

1951. During this time he received special training as a butcher in an Army meat-cutting school, and he was taught to cook and bake in an Army food-service school. Upon separation from the military, he was employed as a truck driver and route salesman for the Myers Bakery Company for about three or four months. During the following 30 months, plaintiff was employed by two meat-packing companies, the D & W Packing Company and the Wilson Packing Company. His job with these two employers consisted of cutting up wholesale meat and making casings for sausages. Following this period, the plaintiff was employed by the Iowa Manufacturing Company for ten or eleven months, and his job consisted of installing bearings on heavy road equipment. The following year plaintiff was employed at several locations at two of which he drove a truck as a route salesman, and at another he was employed as a tester for milk coolers. His last employment was by A. D. Snipper as a butcher preparing both wholesale and retail cuts of meat. He stopped work about July 15, 1959, with the announced purpose of going into the construction business with his brother, which did not materialize. A few months prior to this date he had been bothered by periodic popping noises in his left ear accompanied by a feeling of dizziness, but these were slight and soon passed away.

During August 1959 plaintiff suffered his first serious spell of what he described as a "popping" in his left ear which resembled radio static, and it caused him to lose his sense of balance and to become nauseated. This continued for a day or two during which he could not even retain water. He first consulted a Dr. Calhoun, who made a general examination of the plaintiff and prescribed pills for him to take. Plaintiff failed to improve and he became so ill that he could not walk and he lost control of his legs, which felt rubbery and limp and caused him to fall whenever he would try to stand.

In September 1959 plaintiff was examined by a Dr. Williams, who found the plaintiff had an inner ear disturbance in his left ear and prescribed the same type of pills that had been prescribed by Dr. Calhoun.

Two or three days after seeing Dr. Williams, the plaintiff consulted Dr. William Hibbitts. After hearing the plaintiff's history of his illness and giving him a general checkup, the doctor diagnosed the plaintiff's condition as an inner ear trouble. The doctor advised a series of tests which could be made less expensively at the Veterans Administration Hospital at Shreveport, La.

The plaintiff entered the VA Hospital at Shreveport, La., on November 30, 1959, and following a complete examination, including blood tests, examination of the eyes and ears, x-rays of his head, plaintiff was given pills or capsules to take. The diagnosis was much the same as that of Dr. Hibbitts, and he was discharged on December 18, 1959.

The plaintiff returned home but he suffered a severe recurrence of the symptoms a few days after New Year's Day when he became very dizzy while walking toward the front door and blacked out and fell through the door. When he regained consciousness, he was on his bed and Dr. Hibbitts had been called. The doctor, suspecting a brain tumor, advised the plaintiff to return to the VA Hospital at Shreveport, which he did on January 5, 1960, and remained there for four months. Plaintiff was prescribed pills to take and the left side of his nose was operated on to allow passage of more air. This operation helped him breathe through his nose, but he still had ear noises and complained of nausea. Plaintiff was placed on a salt-free diet to help his stomach condition and to lose weight, and as for his head noises, the doctors advised him that he would just have to become accustomed to them. During the plaintiff's stay at the Shreveport VA Hospital, he was called to the Little Rock VA Hospital relative to a Veterans Administration pension, where he was given a thorough physical examination, including x-rays of the head, arms and a heart check-up.

Several months after the plaintiff had returned from the Shreveport VA Hospital, the plaintiff resumed his treatment by Dr. Hibbitts, who advised the plaintiff to return to the VA Hospital at Little Rock for a spinal tap and other special tests to determine whether or not the plaintiff had a brain tumor. Plaintiff was admitted at the Little Rock VA Hospital on March 13, 1961, and he remained there for eleven days. At that time he was taken off his salt-free diet in an effort to check on its effect. After a day and a night of this diet, the plaintiff began to vomit and by the fifth day he was still suffering from nausea. The doctor could find no cause, and the previous medication (Dramamine) was resumed. Various tests were made, including electroencephalogram, blood tests, x-rays of the head, chest, legs and back, and a spinal tap was performed. Plaintiff was informed that the tests revealed inner ear trouble but no brain tumor, and an air encephalogram was suggested, but the plaintiff felt that since the doctor had told him that the chance of it showing the cause of his illness was "one in a million," that it should not be done because he was afraid of the risk.

These medical reports were forwarded to Dr. Hibbitts who studied the reports and told plaintiff that the only thing he knew to do was to continue with the pills as before and to try new things as he heard of them, as he knew of no present cure for this ailment.

Plaintiff's present condition is summarized by the hearing examiner as follows:

"At present claimant has dizziness, sometimes two or three times a day and sometimes two or three times a week. The claimant stated that six days before the hearing he had attempted to rake the yard and fell; he did not know how long he had been unconscious but he had to hold to the steps and house to get inside and lie down. Sometimes it takes about thirty minutes and sometimes two or three hours for the dizziness to leave after claimant lies down.

Claimant states he still hears the same tapping and popping noises in both ears now. Claimant is still on salt-free diet which is partly for weight reducing purposes. He said he uses a cane when he gets real bad; the last time was about three months before the hearing. The claimant said he just sits around the house; does very little walking and only if someone is with him. He has not driven a car in the last six months and prior to that time for approximately a year and a half he had only driven when someone was with him. Dr. Eschenbrenner and Dr. Hibbitts had both advised him against driving."

The medical report of Dr. Hibbitts dated September 27, 1960, indicates August 1959 as the date of onset of the present illness with symptoms of dizziness and nausea on exertion. The diagnosis was Meniere's disease, labyrinthitis, and indicated poor response to therapy. The report states that the plaintiff could only remain up and around for short intervals. Another report by the same doctor dated April 7, 1961, states that plaintiff's subjective symptoms are dizziness and weakness, that electrocardiogram was normal, and laboratory tests are negative, that plaintiff's cardiac, respiratory and neurological conditions are normal, and it gives a diagnosis of severe labyrinthitis and states that plaintiff has shown no results from treatment and is totally disabled.

Dorland's Medical Dictionary, 23rd Ed., defines Meniere's disease or syndrome as dizziness, tinnitus (ear noise) characterized by popping and cracking sounds, and dizziness occurring in association with nonsuppurative (non-pus producing) disease of the labyrinth (inner ear). Labyrinthitis is defined as inflammation of the labyrinth or inner ear.

The reports from the Shreveport VA Hospital dated February 4, 1960, and April 5, 1960, record plaintiff's two confinements in this hospital. The first report indicates that the plaintiff was placed on a low-salt diet, given Dramamine and nicotinic acid. An audiogram was per-

formed, his symptoms subsided, and he was discharged on December 18, 1959. The diagnosis was: "acute labyrinthitis, marked treated and improved."

The second report indicated that the plaintiff was readmitted on January 5, 1960, with a diagnosis of acute labyrinthitis, that he had weakness and could not stand up. Besides his nose trouble, plaintiff was observed to have some loss of hearing in the left ear, but the labyrinthitis and dizziness were not entirely confirmed. The examining doctor stated that the plaintiff was able to drive a car and that he observed the plaintiff walking around with no apparent difficulty with reference to his labyrinthitis. The latter report listed a diagnosis of (1) deafness, left, mild, conductive in type; treated, improved, (2) allergic rhinitis; treated, improved, (3) obesity, treated, improved.

A summary medical report from the VA Hospital in Little Rock dated March 24, 1961, states that the plaintiff was admitted on March 13, 1961, because of trouble with his left ear, including 18 or 19 months period of chronic roar in that ear with decrease in hearing perception and also attacks of unsteadiness on his feet with nausea and vomiting. Plaintiff's medical history reveals many illnesses, including a skull fracture in 1943 and other trauma. The ear consultant found decreased hearing in the left ear and confirmed a diagnosis of Meniere's syndrome. The neurosurgeon found no definite objective neurological signs. There was some indication of a little sensory change in the left side of the plaintiff's face, and perhaps a smoothing of the left side of the face.

X-ray of the skull indicates that the transverse depression in the back part of the upper surface of the sphenoid bone or the wedge-shaped bone at the base of the skull, which contains the pituitary body and the circular sinus, appears normal in size and configuration. There are some decomposition defects in the crown of the cranium bilaterally consistent with venous lakes. There appears to be some asymmetry of the hard bones in the area of the internal auditory canal with a faint suggestion of an enlargement of the internal auditory canal on the left. There is a hardening change with loss of the normal air cells in the mastoid process on the right. Study of the internal auditory canal necessitates a perfectly positioned Towne's view of the skull, which this was not. There are suggestive changes in this region, and it is recommended that the patient be returned for repeat Towne's view and special views of the hard bones on the left. If this is a real finding, it would be consistent with a tumor on the acoustical nerve. Additional views of the skull and review of the previous views show an abnormal porousness or diminution in density and weight of the left side of the occipital bone at the back of the head adjacent to the foramen magnum, or large opening of this bone, through which passes the lower part of the truncated cone of nervous tissue continuous above with the organ connecting the cerebrum and cerebellum and below with the spinal cord, and excessive demineralization or elimination of mineral or inorganic salts, of the left side of the quadrilateral plate of the sphenoid bone at the base of the skull and left posterior clinoid bone, suggesting a space occupying lesion of the left posterior hollow or depression in this area of the skull.

The final diagnoses were: (1) Meniere's syndrome, untreated, unchanged, and (2) decreased hearing, left ear, untreated, unchanged.

The plaintiff has met the special earnings requirements for disability purposes as of the date he alleged his onset of disability. The earnings record is also sufficient to meet such special earnings requirements through the calendar quarter ending September 30, 1963.

The only issue before the court upon the record is whether there is substantial evidence in the record to support the decision of the Secretary that plaintiff failed to establish that he was entitled to a disability freeze or to monthly disability insurance benefits as of the date of his alleged onset of disability.

 The burden of proof is upon the plaintiff. Not only are the findings of fact made by the hearing examiner, if supported by substantial evidence, conclusive, but a majority of courts also extend the finality of the hearing examiner's findings to inferences and conclusions which he draws from the evidence if there is substantial basis for the conclusion. The hearing examiner's conclusions of law, however, are not binding upon the court, although they are entitled to great weight. In reviewing the decision of the hearing examiner, this court must not abdicate its conventional function. Blanscet v. Ribicoff (W.D.Ark. 1962), 201 F.Supp. 257; Morris v. Ribicoff (W.D.Ark.1961), 194 F.Supp. 841; Harmon v. Ribicoff (W.D.Ark.1961), 192 F.Supp. 743. The court's function in a review of this nature was succinctly summarized in Lewis v. Flemming, 176 F. Supp. 872, at page 874 (E.D.Ark.1959), when the court said:

"In an action of this kind, judicial review should go no further than to determine whether the findings made by the administrative fact finder are supported by substantial evidence and whether applicable principles of law have been correctly applied to the facts. Arbitrary or capricious action must be set aside, and, of course, a finding or conclusion based upon an erroneous view of the law cannot be sustained."

The meaning of the term "substantial evidence" and the application of that term by the court is, of course, of paramount importance in a determination of this case. The meaning and application of the "substantial evidence" test in Social Security cases have been subject to discussion in several recent cases.

 In Wray v. Flemming (W.D.Ark. 1960), 181 F.Supp. 783, 786, this court adopted the definition of substantial evidence as found in 4 Davis, Treatise on Administrative Law, Sec. 29.02, at page 118 as follows:

"In recent decades the principal guide to the meaning of substantial evidence has been a Supreme Court statement written by Chief Justice Hughes: 'Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' [Consolidated Edison Co. v. N. L. R. B., 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938).] A later statement clarifies further: Substantial evidence 'means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' [N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939).]"

See, also, Blanscet v. Ribicoff, supra; Morris v. Ribicoff, supra; Harmon v. Ribicoff, supra.

Disability is defined in 42 U.S.C.A. §§ 416(i) (1) and 423(c) (2), as meaning:

" * * * inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration * * *."

The Social Security Administration characterizes the requirement of an indefinite duration in 20 C.F.R., Sec. 404.-1502(f), 42 U.S.C.A.Appendix, as follows:

"Under the law, an impairment must also be expected either to continue for a long and indefinite period or to result in death. Indefinite is used in the sense that it cannot reasonably be anticipated that the impairment will, in the foreseeable future, be so diminished as no longer to prevent substantial gainful activity."

In 20 C.F.R., Sec. 404.1510 (Supp. 1961), the Administration utilizes the fol-

lowing medical factors in determining the effect of impairments:

"(a) In order to establish that a medically determinable physical or mental impairment (see § 404.1501 (a) or (b) (1) is present there should be evidence that medically discernible anatomical, physiological, biochemical or psychological aberrations exist. Allegations of inability to work as a result of impairment such as dyspnea (shortness of breath), pain, lack of musculo-skeletal function, decreased vision or hearing, decreased memory, etc., should be shown to result from structural, physiological or psychological changes which can be identified by the use of clinical and laboratory diagnostic techniques. An alleged impairment is medically determinable only if it can be verified by the use of clinical and laboratory diagnostic techniques.

"(b) The medical evidence should be complete enough to support an independent diagnostic, therapeutic and prognostic conclusion by the State agency or the Social Security Administration, as the case may be, and form a clear picture of the individual's functional limitations (e g., where dyspnea (shortness of breath) is reported, the level of activity at which it occurs should be described). The impairment should be described etiologically (cause), pathologically (structural change), physiologically (functional), psychologically, and therapeutically (treatment and response).

"(c) In determining the severity and expected duration of an impairment, consideration is given to:

\*　　\*　　\*　　\*　　\*　　\*

"(2) The extent to which the disease interferes with the ability of all body systems to contribute their share to the individual's capacity for walking, sitting, standing, bending, remembering, seeing, speaking, hearing, manipulating and maintaining interpersonal relationships; \* \*."

In 20 C.F.R., Sec. 404.1512, the impairments of hearing applicable to the present case are set forth as follows:

"(b) Auditory impairments. Auditory efficiency is measured on the basis of auditory testing of air, nerve and bone conduction which shows how much hearing capacity the individual has with a hearing aid. In cases of advanced diseases of the inner ear, consideration is given to whether there is severe and frequent vertigo, nausea, and staggering gait in addition to static or progressive hearing loss."

The hearing examiner in his decision gives little weight to the findings of Dr. Hibbitts pertaining to plaintiff's subjective symptoms upon which this doctor based his opinion that the plaintiff was totally disabled. On the other hand, the examiner places considerably more weight upon the VA Hospital reports from Shreveport and Little Rock, especially that from the Little Rock VA Hospital, since these reports are mainly restricted to objective findings based upon approved clinical and laboratory diagnostic procedures. However, the point is that Dr. Hibbitts recommended that the plaintiff go to the VA Hospitals in order to have all the necessary tests conducted which would have been prohibitively expensive to the plaintiff if done elsewhere, and when the reports of all these objective findings were in, Dr. Hibbitts made his final report based upon these complete reports of objective findings plus the subjective symptoms which he had observed before arriving at his diagnosis that the plaintiff was suffering from Meniere's syndrome, which could be treated only to the limited extent of giving the plaintiff pills in order to partially mitigate the symptoms of diziness, ear noise and nausea.

The applicable statutes and regulations require a medically determinable physical impairment which can be expected to continue for a long and indefinite period of time of such an extent as to prevent a person in engaging in any substantial gainful activity before dis-

ability can be granted. There is no doubt that the plaintiff has a medically determinable impairment, verified by approved objective findings, which will be of long and indefinite duration. All of the examining doctors are unanimous in their conclusion that plaintiff's affliction cannot be cured, and that present modes of treatment are considerably less than 100 percent effective.

The only remaining question is whether this recognized impairment on the part of the plaintiff is of such magnitude so as to prevent him from engaging in substantial gainful activity. As stated above, in 20 C.F.R., Sec. 404.1512(b) (Supp.1961), where there is an auditory impairment the medical factors of severe and frequent vertigo, or dizziness, nausea and staggering gait may be taken into consideration in order to determine the extent of the disability. The plaintiff and his wife have testified as to the severity and frequency of plaintiff's subjective symptoms, and incidents of his nausea and vertigo have been recorded by Dr. Hibbitts and VA Hospitals. Yet the examiner chose to emphasize the fact that the plaintiff was not observed to stagger around in the wards of the VA Hospitals at all times during his stays there. Dr. Hibbitts and one of the VA doctors advised plaintiff not to drive a car at all, or at least have someone with him should he attempt to drive, but the examiner emphasized the fact that another of the VA doctors stated in his report that the plaintiff would have no restrictions on his driving of an automobile. The hearing examiner further concluded that since Meniere's syndrome may occur with various degrees of severity and none of the medical reports chose to indicate the severity of plaintiff's particular affliction, that therefore his case was not of that degree of severity which would disable him within the provisions of the applicable statutes and regulations. This conclusion of the examiner is not based upon any substantial evidence as reflected by the transcript, for in none of the medical reports did the doctors indicate that Meniere's syndrome is manifest-ed by any degrees of severity. Either the subjective symptoms of this particular syndrome are present or they are not. The frequency and severity of attacks of Meniere's syndrome may vary from person to person, but these variations do not affect its seriousness as a physical impairment of the plaintiff or of anyone suffering its effects.

Meniere's syndrome is not a common disease, and research by the parties and by the court has failed to uncover any Social Security cases in which this impairment is involved and the legal significance thereof. However, this particular affliction has been discussed thoroughly in two cases and though it occurred in different contexts in each of these cases from that of the present case, the severity and legal significance of such an impairment were pointed out by the courts.

In the case of Perret v. Toye Bros. Yellow Cab Co. (La.App.1944), 17 So.2d 835, the court characterized Meniere's disease as a permanent affliction which is capable of either spontaneous recurrence or recurrence induced by external causes such as trauma. The medical testimony described Meniere's disease as a disease which is associated with any disturbance in the middle ear that brings about consequent disturbance in the vestibular nerve, which is the nerve that controls equilibrium. The causes of such a disturbance include (1) infection anywhere in the body which can produce it; (2) toxic causes, such as intestinal disturbance or other severe illnesses that may produce a toxemia; (3) arteriosclerosis; (4) neurosis which can produce a simulated condition; and (5) the most prominent cause is a true infection in the ear, nose, and throat system, namely a block of the Eustachian tube which, by producing a retraction of the drum, brings about a lack of aeration which in turn brings about a disturbance of the vestibular nerve. This condition has a tendency to recur due to a lack of an adequate method of treatment.

In the case of State v. Gooze (1951), 14 N.J.Super. 277, 81 A.2d 811, the New Jersey Superior Court, App.Div., sustain-

ed defendant's conviction by a lower court where a violation of a state statute penalizes as a misdemeanor any person causing the death of another by driving any vehicle carelessly and heedlessly in willful and wanton disregard for the rights and safety of others. The facts were that little more than a year prior to the date of the collision, the defendant had suffered an attack of Meniere's syndrome with the same symptoms suffered by the plaintiff in the present case. His doctor treated him and discharged him five months later with the admonition that he might suffer a sudden recurrence of the disease and that he should never drive an automobile without someone with him. At the time of the collision for which the conviction was sustained, the defendant was driving his automobile alone. Although he stated that he had had no recurrence from the time of the first attack, he nevertheless was seized with a sudden recurrence, blacked out, and collided head-on with the car driven by the deceased. The Superior Court, in affirming the conviction, held that since the defendant drove his automobile on a through state highway with knowledge that at any time, suddenly, without warning, he might lose consciousness or suffer a dizzy spell from his disease, diagnosed as Meniere's syndrome, his act of driving his automobile constituted wantonness justifying his conviction under the state statute in question. The court in this case equated Meniere's syndrome with epilepsy as to the serious and sudden nature of the attacks to which the sufferer is subjected.

The extensive medical testimony upon which this conviction was based described Meniere's syndrome as a term applied to a disturbance in the equilibrium, and it is usually the result of a malfunction of the three semi-circular canals in the inner ear, and there is a disturbance in their function at that particular time. This syndrome demonstrates itself by attacks of dizziness, disturbance in gait, sometimes causing the sufferers to walk as if they are wobbly, sometimes they are caused to look as if they are drunk.

The chief complaint is dizziness where the room spins around as in objective vertigo.

Meniere's disease is described in Gray, Attorney's Textbook of Medicine, at Sec. 187.33, as follows:

"Meniere's disease, inflammation of the semi-circular canals of the inner ear, is characterized by attacks of dizziness together with various disturbances of the hearing and visual mechanisms. Treatment is difficult and recurrence very common. Therefore, the outlook is grave. Occupation should not be undertaken that may lead to accident through disturbances in hearing, vision, or dizziness such as driving cars, use of ladders, scaffolds and about moving machinery."

The point is that Meniere's syndrome or disease, from a medical standpoint, is a recognized physical impairment which can be induced by any of several causes; it may manifest itself in any or all of several symptoms; it is capable of determination and verification by approved laboratory and clinical observation; it is incapable of being completely curable; it is of indefinite duration and its effects or symptoms can at best be minimized solely by prescription of pills. From a legal standpoint, Meniere's syndrome is considered a permanent disability capable of recurrence by any cause, and its effects on a driver of an automobile thus afflicted, who knowingly drives alone, are considered serious enough to sustain a criminal conviction of negligent homicide where a collision and resulting death of another are caused thereby. Therefore it is the opinion of this court that plaintiff's affliction with Meniere's syndrome is a serious physical impairment of indefinite duration, and the conclusion of the hearing examiner to the contrary is not supported by substantial evidence.

Granted that plaintiff is afflicted with a physical impairment of a serious nature, the next question is whether he is able to engage in substantial gainful activity

within the provisions of the applicable statutes and regulations.

The hearing examiner apparently failed to give any consideration as to the manner in which the plaintiff's impairments affected him as an individual in a quest to secure and perform work which could be classified as substantial gainful activity. In Dunn v. Folsom (W.D.Ark. 1958), 166 F.Supp. 44, at page 48, this court said:

"* * * the act is concerned not with a standard man of ordinary and customary abilities, but with the particular person who may claim its benefits and the effect of the impairment upon that person, with whatever abilities or inabilities he has. Thus plaintiff's impairments would not prevent him from teaching courses in law, but the provisions of the act would be utterly futile if 'any substantial gainful activity' means activity utterly beyond the capacity of the particular person involved. 'Any substantial gainful activity' is such activity for which the particular claimant is reasonably qualified by education, training, or skill. Compare cases relating to 'total disability' under War Risk and National Service Life Insurance. * * * Thus, if a medically determinable physical impairment exists, the court should consider whether such impairment prevents the particular plaintiff from engaging in any substantial gainful activity for which he is qualified, and to that end may consider his education, training, and experience, as well as the nature and extent of the impairment itself."

In examining the plaintiff's ability or disability to pursue any substantial gainful activity, including his past impairments, the statement of this court in Dunn v. Folsom, supra, should also be taken into consideration. There the court at page 49 of 166 F.Supp. said:

"It should also be noted that the word 'substantial' as used in Secs. 416 and 423 does not modify 'gainful', but rather modifies 'activity.'

The activity in which the plaintiff must be able to engage must not only be 'gainful' but it must also be 'substantial.' The determinative factor here is not how substantial the gain is, but how substantial the activity in which the plaintiff could gainfully engage. Measuring this requirement in terms of time and physical and mental effort, it is apparent that this plaintiff, even after the proposed operation, cannot be expected to engage in any substantial activity for which he is qualified, and his disability is therefore, so far as the record reflects, one of 'indefinite duration,' both as of the time of hearing and as of the time of injury."

See 20 C.F.R., Sec. 404.1502(h), (Supp. 1961).

Plaintiff's principal occupation in the past has been that of a meat cutter. Not only does this occupation involve the use of sharp cutting instruments, but some meat cutting instruments are powered. To say the least, one suffering from Meniere's syndrome would be subject to many hazards as a meat cutter, assuming that he could gain employment as such in the first place after making known his affliction to a prospective employer. Plaintiff has driven a delivery truck in the past, but this line of work would no longer be open to him. He has been employed as a machinist, using power tools in work around heavy machinery, but the hazards in this line of work would be as serious to him as it would be in employment as a meat cutter. In any case, it is unlikely that the plaintiff could ever gain reemployment in any of his former lines of work to begin with, much less hold down such employment. Plaintiff's educational limitations would preclude him from obtaining employment which would require substantial mental activity even if he were suited educational-wise to engage in a line of work commensurate with this ability. His dizzy spells and attacks of nausea would handicap him as much as if he were pursuing a line of employment requiring

strenuous physical exertion or coordination.

In this connection the recent case of Ellerman v. Flemming (W.D.Mo.1960), 188 F.Supp. 521, also warrants consideration. In the Ellerman case, Chief Judge Ridge said at page 527:

"Under the Social Security Act, unlike some other statutes, it is not the burden of the claimant to introduce evidence which negatives every imaginable job open to men with his impairment, and of his age, experience and education. It is quite enough if he offers evidence of what he has done, of his inability to do that kind of work any longer, and, of his lack of particular experience for any other type of job. If there are other kinds of work which are available and for which the claimant is suited, it is the defendant's burden to adduce some evidence from which a finding can be made that he can do some type of work; actually, not apparently. Parfenuk v. Flemming, D.C.Mass.1960, 182 F.Supp. 532. Here, the Referee has made no such finding, whatsoever, based on evidence."

Based upon the complete record before the court, including plaintiff's various physical ailments, together with his lack of training, education or skill, the court is convinced that the plaintiff sustained his burden of proving disability and a period of disability as defined in the act, and that the conclusions of the hearing examiner and the Appeals Council to the contrary were not based upon substantial evidence or upon a proper application of the governing law.

Therefore, an order is being entered today in accordance with this opinion, denying the defendant's motion for summary judgment, and reversing and remanding the case to the defendant Secretary with directions that the plaintiff be granted a period of disability and disability benefits in accordance with his application.