639 A.2d 718

IN THE MATTER OF ANASTASIA M. VEY, POLICE
OFFICER OF NORTH WILDWOOD CITY.

Argued November 29, 1993—Decided March 31, 1994.

*Robert P. Beakley* argued the cause for appellant, Anastasia M. Vey (*Wallen and Beakley,* attorneys).

*David S. DeWeese* argued the cause for respondent City of North Wildwood (*Stagliano & DeWeese,* attorneys).

*June K. Forrest,* Senior Deputy Attorney General, argued the cause for respondent New Jersey Merit System Board (*Fred DeVesa,* Acting Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel).

PER CURIAM.

This matter, which has an extensive history, is before us for the second time. In our first decision, we remanded the matter to the Merit System Board (the Board) in the Department of Personnel to "relate its findings in this case to the statutory qualifications" for a law-enforcement officer. 124 *N.J.* 534, 536, 591 *A.*2d 1333 (1991). The basic issue on this appeal is whether the Board complied with the terms of the remand. The Appellate Division

found that it had so complied. 272 *N.J.Super.* 199, 639 *A.*2d 724 (1993). In so finding, the Appellate Division relied on the familiar principle that appellate courts ordinarily sustain the decisions of administrative agencies unless those decisions are arbitrary, capricious, or unreasonable, or are not supported by substantial credible evidence. *Henry v. Rahway State Prison,* 81 *N.J.* 571, 579–80, 410 *A.*2d 686 (1980). We affirm substantially for the reasons stated by the Appellate Division. 272 *N.J.Super.* at 199, 639 *A.*2d 724.

We note, as did the Appellate Division, that Vey's negative test results were consistent with "the observed negative trend in [her] behavior and work performance...." 272 *N.J.Super.* at 205, 639 *A.*2d 724. In brief, the facts and the psychological tests both point to the conclusion that appellant would not be an effective law-enforcement officer.

Society reposes in police officers responsibilities that are simultaneously weighty, sensitive, and fraught with dangerous consequences to themselves, other police officers, and the public. Police officers are authorized to carry firearms, *N.J.S.A.* 2C:39–5 to –6a(3), and to use deadly force in justifiable circumstances, *N.J.S.A.* 2C:3–7. They can engage in high-speed chases with absolute immunity from suit, *Tice v. Cramer,* 133 *N.J.* 347, 627 *A.*2d 1090 (1993); they are called on, in certain instances, to stop motor vehicles and search passengers without probable cause, *State v. Muhammed,* 134 *N.J.* 599, 637 *A.*2d 158 (1994); and they are sometimes required to intervene in domestic disputes, *N.J.S.A.* 2C:25–17 to –33. Not everyone can do that kind of work. Fresh in our memory is the police brutality that underlay the officer's conviction in *State v. O'Donnell,* 117 *N.J.* 210, 564 *A.*2d 1202 (1989). That incident serves to remind us that police work is not just another job and that some people should not serve as police officers.

█ We cannot say that the Board was arbitrary, capricious, or unreasonable in finding unfit for police work an applicant who is, among other things, "impulsive," "manipulative," "irresponsible,"

"easily frustrated," "unpredictable," "careless," "defensive," "assertive and bold with advisory personnel," "suspicious," and "uninhibited and spontaneous."

Our dissenting colleagues urge that before declining to offer employment to Vey, the North Wildwood Police Department now should first test all of its current police officers and compare those test results with Vey's results. *Post* at 315, 639 *A.*2d at 722. We imposed no such requirement in our original opinion, and we decline to do so at this late date. Similarly, although the dissent challenges the value of the Minnesota Multiphasic Personality Inventory (MMPI) test, *post* at 313, 639 *A.*2d at 721, we did not question the test in the original opinion. The test is nationally used and officially recognized by the Board in *N.J.A.C.* 4A:4-6.5(f)(5). Furthermore, Vey's own expert relied on the MMPI test when evaluating her. Finally, at no stage of this protracted proceeding has appellant ever asserted that any governmental agency, state or municipal, discriminated against her because of her gender or that any of the psychological tests were unfair to women. Indeed, in our original opinion, we expressly stated that the "case before us is not an employment-discrimination case and does not raise questions of disproportionate impact of the testing criteria...." 124 *N.J.* at 541, 591 *A.*2d 1333. The dissent's attempt to inject such questions now, *post* at 309–10, 639 *A.*2d at 719–20, is at once gratuitous, belated, and unfounded.

The judgment of the Appellate Division is affirmed.

For affirmance—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK and GARIBALDI—5.

For reversal—Justices O'HERN and STEIN—2.

O'HERN, J., dissenting.

In this case, a woman has been denied a job as a police officer because of her personality traits. Among her traits that the employing authority deems disqualifying for police work are that

she is bold, suspicious, and easily frustrated. Consider the logic: the opposite traits are timid, trusting, and apathetic. Are those the traits of a police officer? Of course not. That gives rise to concern whether a double standard is being invoked when such traits are implemented to disqualify a woman from police duty.

"Historically, women, as well as racial minorities, have been excluded from police and firefighter positions. Only recently * * * have many police and fire departments begun to permit women to apply for employment." Ruth Colker, *Rank–Order Physical Abilities Selection Devices for Traditionally Male Occupations as Gender–Based Employment Discrimination,* 19 *U.C.Davis L.Rev.* 761, 761 (1986). "Certain jobs in our society are misconstrued as requiring traits predominantly associated with men. * * * Despite some progress towards gender equality, these stereotypes remain remarkably resilient. As a result of these informal barriers, females aspiring to non-traditional or high status jobs are continuously subjected to a double standard." Susan Struth, *Permissible Sexual Stereotyping Versus Impermissible Sexual Stereotyping: A Theory of Causation,* 34 *N.Y.L.Sch. L.Rev.* 679, 679–80 (1989) (footnote omitted).

When reliance on personal qualifications such as personality traits is used in hiring practices, the question arises whether "females suffer disproportionately from this evaluative device, which, although neutral on its face, is affected profoundly by preconceived notions of the 'appropriate' roles and traits of women and men." Mary F. Radford, *Sex Stereotyping and the Promotion of Women to Positions of Power,* 41 *Hastings L.J.* 471, 474 (1990).

Precisely to overcome such preconceived notions, we previously remanded this case to the New Jersey Department of Personnel (DOP) to demonstrate, in a scientifically-reliable way, whether Vey's personality traits manifested a mental disease or defect, and, if they did not, to show by a professionally-accepted validation method that the traits relied on to disqualify her were actually related to job performance. On remand, the appointing

authority, City of North Wildwood, listed eleven personality traits of the job applicant and explained briefly how each would preclude effective performance of a police officer's duties. (DOP concedes that her traits do not manifest a mental disease or defect.) The Medical Review Panel (Panel), which evaluates such matters for DOP, failed to demonstrate that an established validation method had been used in correlating the job specifications for a police officer with these psychological test results. Nonetheless, the Appellate Division found that the Panel "correlated adequately the disqualifying 'personality traits' with the job standards and functions," 272 *N.J.Super.* 199, 205, 639 *A.*2d 724 (1993), and affirmed, adopting the conclusion of DOP's Merit System Board that " 'Anastasia Vey is mentally unfit to perform effectively the duties of a Police Officer.'" *Id.* at 202, 639 *A.*2d 724. We granted certification, 133 *N.J.* 445, 627 *A.*2d 1149 (1993).

Because the decision and judgment are not in accord with our remand, I would reverse the judgment and restore Anastasia Vey's name to the list of eligible candidates for a police officer position in the North Wildwood Police Department (NWPD).

I

We must review the history of this case as set forth in *In re Vey,* 124 *N.J.* 534, 591 *A.*2d 1333 (1991) (*Vey* I). Anastasia Vey began working for the NWPD as a summer police officer in June 1982. In 1986, she decided that she wanted to work as a full-time officer. That same year she applied for a law-enforcement position with the New Jersey State Police (State Police) and the NWPD. She passed a State-administered Civil Service examination for the position of police officer. DOP certified her "eligible" for employment and placed her name on an eligibility list. Vey also had to submit to various psychological evaluations. The State Police found her psychologically qualified and offered her a position. She declined, wishing instead to work in her hometown of North Wildwood.

The NWPD notified Vey that due to a negative psychological report, it was not accepting her as a member of its January 1987 class of police officers. That report described her generally as pleasant, cooperative, articulate, and above average intellectually, but showing some tendency to be impulsive, anxious, agitated, worrying more than most people, somewhat apprehensive and insecure, having a "low tolerance for frustration." Her chances of success as a police officer were thought to be "below average at this time."

Vey requested a new psychological examination. The second evaluator found her to be, among other things, "positive" with good reality testing; "more * * * likely [than the average person] to get emotional and frustrated"; "impulsive," "suspicious," "assertive," and "bold." He, too, continued to assert that "while Ms. Vey has many strengths, her potential for functioning well in the long term in law enforcement as a police officer are below average."

The City of North Wildwood requested that DOP, which administers the Civil Service laws, remove Vey's name from the eligibility list. Vey submitted her own evaluator's report that concluded that she was above average in leadership potential. Vey also submitted recommendations of her former supervisors while she worked at the NWPD that indicated she was "an outstanding person," "well liked," an "asset to [her] squad," and one who "leaves nothing to be desired in all phases of her work."

Despite the absence of any evidence other than that Ms. Vey might have somewhat below-average potential, the Merit System Board removed her name from the eligibility list on the basis that she was "mentally unfit to perform effectively the duties of the position," a finding nowhere found in the data submitted. Vey appealed to the Appellate Division, which, in its unpublished opinion, accorded deference to the agency in matters of what it called "scientific specialization." A dissenting member of the Appellate Division concluded that a finding of "below average" prognosis for success as a police officer did not make Vey unfit.

On Vey's appeal to us as of right, *R.* 2:2–1(a)(2), we remanded the matter to DOP because its decision failed to explain how the record established that Vey was "mentally unfit to perform effectively the duties of the position." *Vey* I, *supra*, 124 *N.J.* at 538, 591 *A.*2d 1333. Justice Stein dissented at that time, concluding "there is nothing in the record that suggests, much less demonstrates, psychological unfitness for appointment. This applicant has waited long enough for a decision on her application to the NWPD." *Id.* at 546, 591 *A.*2d 1333. Accordingly, he would have restored her to the eligibility list at that time. In retrospect, that is what we should have done.

## II

In *Vey* I, we pointed out that psychological tests, like intelligence or agility tests, are only as good as their correlation to actual job performance. *Id.* at 540, 591 *A.*2d 1333. Accordingly, recognizing that there is a degree of mysticism about psychological evaluations, we required that on remand two things be done: (1) that the Panel clarify whether the personality traits of Ms. Vey constituted a recognizable mental disease or defect, and (2) that, if they did not, the employer demonstrate by a professionally-acceptable validation method that the traits or characteristics used to disqualify her were actually related to job performance.

On the first score, Ms. Vey concededly does not suffer from any mental disease or defect. She is in all respects a fundamentally sound, healthy person.

DOP disqualified Ms. Vey, however, because certain of her personality traits fall outside of what some consider social norms. A standardized test called the Minnesota Multiphasic Personality Inventory (MMPI) establishes those norms. Civil Service recognizes that test. *N.J.A.C.* 4A:4–6.5(f). In its argument before us, the State emphasized the validity of MMPI testing as actually demonstrative of the character traits involved. I do not dispute the proposition that the MMPI may accurately measure a band of human response to external circumstances and thus what might be

considered the "bell-curve" for usual or normal response to such circumstances.[1]

The question that I have is whether the results of the test are truly related to police work. For that reason, we required in *Vey I* that the employer "must 'demonstrate by "professionally acceptable methods" that the selection device is "predictive of or significantly correlated" with the element of work behavior'" that is being evaluated. 124 *N.J.* at 541, 591 *A.*2d 1333 (quoting *Craig v. County of Los Angeles*, 626 *F.*2d 659, 662 (9th Cir.1980) (quoting *Albemarle Paper Co. v. Moody*, 422 *U.S.* 405, 431, 95 *S.Ct.* 2362, 2378, 45 *L.Ed.*2d 280, 304 (1975)), *cert. denied*, 450 *U.S.* 919, 101 *S.Ct.* 1364, 67 *L.Ed.*2d 345 (1981)).

Instead of establishing by a professionally-accepted method that the selection device was predictive of a correlation with police work, the NWPD submitted a letter from its attorney and the police chief in which they offered anecdotal evaluations of the various traits. No data supported any of their statements. For example, they identified the trait of frustration, taken from the 1986 psychological report, and stated how it would affect a person in the job of police officer:

4. *Frustration*—* * * Ms. Vey has a more than average tendency to get emotional and frustrated. The job of Police Officer is very frustrating to begin with, and if someone is easily frustrated, they will not be able to deal effectively with the daily experiences of a Police Officer. It will also be very difficult for her Supervisors, since she may be very easily frustrated with her assignments and duties.

NWPD's psychological expert conceded that the results of MMPI tests are "the job of the clinician to interpret." The Panel did not relate the trait measurements to police performance. The Panel findings did not, for example, relate the degree of frustration tolerance on the MMPI results to a characteristic such as a "hair-trigger temper" that might result in the unreasonable discharge of

---

[1] Some have questioned the value of comparison with a normative sample of Minnesota residents collected in the late 1930s (it has since been partially revised and updated) as a useful way of judging a young woman in South Jersey today. One might ask what the "normal" response should be to some of the true or false statements posed by the revised MMPI (set forth in Appendix A).

a weapon. The city attorney and the chief of police are not clinicians trained to interpret test results and to relate same to validated profiles of police officers with successful careers. In fact, they did not proffer any personality profile of a police officer with a successful career.

The 1986 psychological evaluation had reported: "She, however, has diminished patience for individuals such as alcoholics, drug abusers, and chronic liars. She is apt to become most enraged when required to deal with individuals that have hurt other people." A bit more intolerance with chronic liars and drug dealers might not be a bad thing for our society. As for the negative trait of defensiveness, I suspect that by the time Ms. Vey got to the second psychological evaluation, she had good reason to be defensive.

In short, the record contains no scientific reliability to the validation undertaken by the NWPD. Validation is not a difficult task at all:

> The preferred method of test validation is criterion-related or empirical validity, which includes what are referred to as the predictive and concurrent methods of validation. Predictive validation consists of a comparison between the examination scores and the subsequent job performance of those applicants who are hired. If there is a sufficient correlation between test scores and job performance, the examination is considered to be a valid or job-related one. Concurrent validation requires the administration of the examination to a group of current employees and a comparison between their relative scores and relative performance on the job.
>
> [*Vulcan Soc. of N.Y.C. Fire Dep't, Inc. v. Civil Serv. Comm'n*, 360 *F.Supp.* 1265, 1273 (S.D.N.Y.), *aff'd in part and remanded by* 490 *F.*2d 387 (2d Cir.1973).]

In plain English, does the record disclose evidence to show that Vey's personality traits have been correlated by the NWPD with proper performance on the part of its officers, or on the part of any comparable sample of police officers? Because psychological testing may be new for the NWPD, a way to validate that test would be to give the test to all of their current officers and compare their test scores with the candidate. Nothing in the

record indicates how other candidates for the NWPD scored on such psychological tests.[2]

Federal uniform guidelines on employee-selection procedures set forth acceptable types of validity studies:

> Evidence of the validity of a test or other selection procedure by a content validity study should consist of *data* showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated. * * * Evidence of the validity of a test or other selection procedure through a construct validity study should consist of *data* showing that the procedure measures the degree to which candidates have identifiable characteristics which have been determined to be important in successful performance in the job for which the candidates are to be evaluated.
>
> [29 *C.F.R.* § 1607.5 (1993) (emphasis added).]

Note that in each case, the linchpin of reliability is *data*, not *dicta*. No evidence of criterion-related, content, or construct validation exists in this record. Of all of the evidence in this record, the best to appear is the second evaluation of Ms. Vey by North Wildwood's psychological consultants who concluded that despite her marginal deficits, "with the appropriate training, monitoring and supervision, she appears able to perform the duties which will be required of her as a police officer." A person who has met that level cannot be said to be unfit for police service.

Recently we validated the eligibility for police duty of a man with a severe handicap because the deficit quality (a loss of vision in one eye) was not shown to have disabled him to handle a gun or make an arrest. *Greenwood v. State Police Training Ctr.*, 127 *N.J.* 500, 606 *A.*2d 336 (1992). We found no objective medical evidence in the record for "the connection between any enhanced risk [of injury] and Greenwood's physical limitation," and determined that Greenwood's visual impairment did not "affect his

---

[2] To be distinguished from criterion-related validation is content testing. Content testing is most easily understood when the subject that is being tested is one that is actually involved in job performance. For example, when a clerical employee is tested for speed of typing, the test will likely predict reliably job performance. P. Jefferson Ballew, Comment, *Courts, Psychologists, and the EEOC's Uniform Guidelines: An Analysis of Recent Trends Affecting Testing as a Means of Employee Selection*, 36 *Emory L.J.* 203, 221–24 (1987).

ability to perform" his police duties. *Id.* at 514, 606 *A*.2d 336. The personal qualifications of Anastasia Vey have not been shown by any professionally-acceptable method to disable her from performing the duties of a police officer. At worst, she will be impatient with drug peddlers, chronic liars, and those who commit acts of violence. At best, in the words of the State Police analyst: "Law enforcement applicants with this MMPI profile tend to be generally well-suited for police work. They can function independently and can tolerate stressful situations well."

I would reverse the judgment of the Appellate Division and restore Anastasia Vey's name to the eligible list.

Justice STEIN joins in this opinion.

### APPENDIX A

#### Questions Posed by the Revised MMPI

- I like mechanics magazines.
- I have not lived the right kind of life.
- I hardly ever feel pain in the back of my neck.
- I am easily downed in an argument.
- I do not mind being made fun of.
- Sometimes when I am not feeling well I am irritable.
- There seems to be a fullness in my head or nose most of the time.
- Someone has it in for me.
- I know who is responsible for most of my troubles.
- I have never indulged in any unusual sex practices.
- I cannot understand what I read as well as I used to.
- At times I feel like picking a fist fight with someone.
- I have been disappointed in love.
- It does not bother me that I am not better looking.
- I drink an unusually large amount of water every day.
- I often think, "I wish I were a child again."
- I shrink from facing a crisis or difficulty.
- After a bad day, I usually need a few drinks to relax.
- My thoughts these days turn more and more to death and the life hereafter.
- I worry a great deal over money.