825 A.2d 1203

DGR COMPANY, APPELLANT, v. STATE, DEPARTMENT OF TREA-
SURY, DIV. OF PROPERTY MANAGEMENT AND CONSTRUC-
TION, RESPONDENT, AND MATTHEW J. BARRICK, JR. RE-
SPONDENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued June 3, 2003—Decided July 1, 2003.

468

Before Judges PRESSLER, CIANCIA [1] and AXELRAD.

Appellant, DGR Company did not file a brief.

*Joseph W. Grather*, argued the cause for respondent/cross-appellant (*Waters, McPherson, McNeil*, attorneys; *Kenneth D. McPherson, Jr.*, of counsel; *Mr. Grather*, on the brief).

*Sudha V. Raja*, Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey*, Acting Attorney General, attorney; *Patrick DeAlmeida*, Deputy Attorney General, of counsel; *Ms. Raja*, on the brief).

The opinion of the court was delivered by

AXELRAD, J.T.C. (temporarily assigned).

The Labor Department sought to consolidate its two Morris County offices in one location. The Division of Property Management and Construction (DPM & C), a unit of the Treasury Department that handles State leases of real property, advertised for lease proposals in Dover. Two potential landlords responded, Matthew Barrick, the owner of the building that the Labor Department was already occupying in Dover, and DGR Company (DGR). Most versions of the advertisement stated the parking requirement as 70 spaces, but at least one stated it as 125 spaces. DPM & C deemed both DGR's and Barrick's proposals to be acceptable. It intended to choose DGR's proposal, but Barrick

---

[1] Judge Ciancia did not participate in oral argument. However, the parties have consented to his participation in the decision.

protested that DGR's parking arrangements did not conform to the contract requirements. That challenge prompted DPM & C to reject the bids, clarify the parking requirement and choose to readvertise and rebid the lease, on the ground that the confusion about the parking requirement might have discouraged proposals from other potential lessors who could have provided adequate parking but not 125 spaces.[2]

DGR appealed DPM & C's decision to readvertise rather than to proceed with its proposal, but its appeal has been dismissed for failure to prosecute. The only matter before us is Barrick's cross-appeal of the agency's decision to reject the bids and rebid the lease. Barrick argues that the provision of 125 parking spaces was a material condition of the Labor Department's space planning request, DPM & C lacked the authority to waive it, and DGR could not satisfy the condition without presuming an illegal appropriation of public parking spaces. He claims the confusion over the required number of spaces was a pretext for readvertising, as demonstrated by prior DPM & C assessments of DGR's parking as inadequate. In addition, he argues that DPM & C lacked the authority to reject his conforming proposal, due to the lack of a compelling reason and due to the lapse of the regulations that would otherwise have given it the discretion to reject all proposals. In the alternative, Barrick argues that DPM & C should be ordered to readvertise "within 30 days," and that the new advertisement should specify that satisfaction of the Labor Department's parking needs in conformity with the ADA means that the parking must be on-site.

After considering the record, briefs, and oral argument in light of the applicable law, including our obligation to defer to the findings of an administrative agency, we are satisfied that the decision of the administrative agency is supported by sufficient credible evidence in the record as a whole and that Barrick's

---

2 We were advised at oral argument that DPM & C is still working out parking requirements and that the project has not, as yet, been rebid.

arguments are without sufficient merit to warrant extensive discussion in a written opinion. *R.* 2:11–3(e)(1)(D) & (E); *and see, e.g., Campbell v. Department of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963). The agency did not abuse its broad discretion in rejecting all bids and rebidding a State lease as a result of an inadvertent error that affected competitive bidding. We add the following explanation of the public bidding process for State leases and the procedural history of the subject bids.

## I.

DPM & C is entrusted with the authority to approve or disapprove agency requests for space, solicit lease proposals, and negotiate leases. *N.J.S.A.* 52:18A–191.3; *see* notes following *N.J.S.A.* 52:18A–178. The Legislature also established the State Leasing and Space Utilization Committee (SLSUC), which must approve all leases and which bases its decisions on DPM & C's recommendations. *N.J.S.A.* 52:18A–191.5. An agency that seeks space must submit to DPM & C a "space planning request" that includes "special program needs" such as "site requirements" and "legislative mandates." *N.J.A.C.* 17:11–1.3.[3] Upon approval of the space planning request, if DPM & C determines that no property already owned or leased by the State is suitable, it must advertise for "available properties." *N.J.A.C.* 17:11–4.3. The advertisement must contain either a "project description" or a "scope of work," the latter being considerably more detailed. *N.J.A.C.* 17:11–4.2(a). The advertisement must appear in the main newspaper serving the location, and it may also appear on the Internet. *N.J.A.C.* 17:11–5.1. The regulations do not mandate the advertisement's contents, but permit it to specify "threshold criteria" for potential lessors to be eligible. *N.J.A.C.* 17:11–5.1(c).

---

[3] The regulations expired on January 2, 2001, and the new regulations, which are essentially the same, were adopted as of January 7, 2003, and were filed two days later without change. 35 *N.J.R.* 623(a) (Feb. 3, 2003). All citations are to the new regulations.

DPM & C determines the eligibility of responding potential lessors according to "the threshold criteria for the advertised use," apparently whether or not the advertisement listed them. *N.J.A.C.* 17:11–5.4(b). It then requests the eligible potential lessors to submit a leased space proposal by a specific date, which may be extended. *N.J.A.C.* 17:11–6.1(a), 17:11–6.2, 17:11–6.3. The potential lessors must base their proposals on the scope of work and provide the "pertinent cost and site information," including rent and services. *N.J.A.C.* 17:11–1.3.

An agency may change or withdraw its space planning request even after DPM & C has begun to receive proposals. *N.J.A.C.* 17:11–4.3(d). DPM & C reviews the proposals to determine which ones satisfy "all material elements" in the scope of work and are "best able to fulfill the space need as defined in the scope of work." *N.J.A.C.* 17:11–6.9. It also reviews the proposals for cost effectiveness, which means being the least-expensive alternative that "can be demonstrated to conform to" the criteria in DPM & C's request for proposals, as well as to the agency's "operational concerns and restrictions." *N.J.A.C.* 17:11–1.3, 17:11–6.9. DPM & C may reject all the proposals for having a "price" that is "unfavorable to the State in the current market," or for any other "compelling" reason. *N.J.A.C.* 17:11–6.8.

For the proposals that pass DPM & C's review, DPM & C negotiates with the potential lessors. *N.J.A.C.* 17:11–6.10. DPM & C then decides which potential lessor to recommend to SLSUC as the one "who will provide the most cost effective proposed lease agreement." *N.J.S.A.* 52:18A–191.4, *N.J.A.C.* 17:11–6.10. However, DPM & C also has the discretion to decide that none of the proposals merits recommendation. *N.J.A.C.* 17:11–6.11. If DPM & C decides to recommend a potential lessor's proposal, it must give a notice of intent to all the other potential lessors, who may challenge the recommendation. *N.J.A.C.* 17:11–6.11, 17:11–8.1(a)(2). After receipt of a challenge, DPM & C may decide not to recommend any proposal. *N.J.A.C.* 17:11–6.11. A challenge requires DPM & C to hold the recommendation in abeyance and

not forward it to SLSUC, except when the failure to award a lease would "result in substantial cost to the State or if the public exigency so requires." *N.J.A.C.* 17:11–8.3(c).

The Director of DPM & C is to resolve a challenge by issuing a written decision on the basis of his or her review of the written record, which includes pertinent administrative rules, statutes and case law, and any other documentation that he or she deems appropriate. *N.J.A.C.* 17:11–8.3(d).

DPM & C's recommendation to SLSUC takes the form of a "notice of proposed lease." *N.J.A.C.* 17:11–6.11, 17:11–7.1. The recommended proposal does not constitute a lease until SLSUC has approved it and the State and the lessor have executed it. *N.J.A.C.* 17:11–6.11, 17:11–7.3. The agency may request cancellation at any time before the lease is executed, which DPM & C has the discretion to grant or deny. *N.J.A.C.* 17:11–7.5.

On May 30, 2000, the Labor Department sent DPM & C an amended space planning request. It sought a building in Dover to house the unemployment insurance, employment training, job placement, and vocational rehabilitation services for Morris County residents that it was currently providing at the time in Morristown and Dover. The Labor Department's request stated that the "current parking allocation" was fifty spaces. One section of it stated that an unspecified number of parking spaces would be needed for clients in addition to fifty spaces for employees, and that the lessor would have to provide parking if a sufficient amount of free public parking was not available in the area; another section gave the combined parking need as 125 spaces. The request also specified that handicapped parking spaces were required under the ADA but it did not specify the amount.

In response to DPM & C's request for it to distinguish between "mandated requirements" and "desirable traits," the Labor Department listed ADA compliance as the only mandated requirement. It listed "parking for staff" and "handicapped parking for staff and clients" as desirable traits with significant weight.

On July 26, 2000, DPM & C issued the scope of work for the amended space planning request. Newspaper advertisements were published on August 18 to 20, 2000, which stated that "[p]arking is needed for 70 vehicles," included the address for DPM & C's Internet site, and advised potential lessors to check the site for updates. DPM & C's Internet advertisement, which was supposed to be consistent with the print advertisements, however, contained discrepancies in the number of parking spaces. The earlier version stated the need as parking for 70 vehicles, while in the later version it was for 125 vehicles. The record does not indicate how or why the change occurred.

On September 18, 2000, DPM & C sent Barrick a request for a proposal, which included a draft lease that left the number of parking spaces to be specified. On November 14, 2000, pursuant to an extension that DPM & C granted, Barrick submitted his proposal for the Dover building that the Labor Department was currently occupying. Barrick's proposal provided for 101 parking spaces, of which two were handicapped spaces, and stated that an additional twenty free spaces of on-street parking were available. DGR also submitted its proposal, which provided for forty parking spaces, of which four would be handicapped spaces, with available street parking of thirty free spaces, and additional parking in a municipal lot. On February 20, 2001, DPM & C's director of administrative services determined eighty parking spaces were sufficient and noted that either of the proposed sites would be acceptable, although Barrick's was preferable because of the proximity of the parking.

On October 17, 2001, Barrick submitted a revised proposal providing for 103 parking spaces of which eight would be for the handicapped, with the availability of twenty spaces of free street parking. On November 20, 2001, DGR affirmed its proposal which included sixty parking spaces in the lot, four handicapped spaces "outside our building," and free parking on all four sides of the building. DPM & C promptly advised both bidders it intended to recommend DGR's proposal, whose square foot rental was

less than Barrick's, and on December 3, 2001, DPM & C granted Barrick an extension of time to challenge it. On December 10, 2001, Barrick filed a challenge and requested a stay, claiming that DGR's proposal failed to meet the number of parking spaces.

On December 12, 2001, DPM & C advised Barrick of its intention to withdraw its recommendation of DGR's proposal from the agenda for the next scheduled SLSUC meeting. On December 21, 2001, DPM & C wrote to inform Barrick that it intended to develop a new scope of work in order to clarify the confusion over the exact parking requirement, and then to advertise for new proposals. The DPM & C was concerned that the misstatement in the Internet advertisement that the parking requirement was 125 parking spaces rather than 70 might have discouraged other potential lessors from submitting proposals.

## II.

In *In re On–Line Games Contract*, 279 *N.J.Super.* 566, 591, 653 *A.*2d 1145 (App.Div.1995), we noted the standard of review that applies to the award of State contracts. In the absence of more specific legislation, *N.J.S.A.* 52:34–12(f) mandates the choice of the bid that " 'will be most advantageous to the State, price and other factors considered,' " and it expressly grants the Treasurer the authority to reject all bids when he or she determines that it is " 'in the public interest so to do.' " *Ibid.* The standard of review for awarding bids under that statute is thus "the absence of bad faith, corruption, fraud or gross abuse of discretion." *Id.* at 592, 653 *A.*2d 1145. However, because the wide latitude conferred on the Treasury Department in awarding contracts under that statute presumes the regularity of the process leading to the award, the standard of review for the Treasurer's determination of whether a bid conformed to the contract specifications was the less-deferential, ordinary standard for administrative action, namely, that the determination was not arbitrary or unreasonable. *Id.* at 593, 653 *A.*2d 1145 (citing *George Harms Constr. Co. v. N.J. Tpk. Auth.*, 137 *N.J.* 8, 27, 644 *A.*2d 76 (1994)).

The question before the *On–Line Games* court was whether the Treasury Department had wrongfully waived a material condition in the contract specifications, *id.* at 589, 653 *A.*2d 1145, and Barrick bases his arguments on the incorrect premise that this case presents the same question. Barrick's premise requires the provision of 125 parking spaces to have been a material condition of the Labor Department's space planning request, yet the ADA does not demand any particular number of spaces, and Barrick does not explain why it would be illegal for the Labor Department to request a number below 125. Furthermore, there is no explanation for the increase from the original statement of the parking requirement as seventy spaces, which means that there is no ground for viewing the increase as material in itself, and thus no ground for accusing DPM & C of seeking to waive a material condition when all it did was correct a misstatement.

Barrick's premise is also unsound in its assumption that this case is governed by the rule for local public contracting that an award must be made unless every bid fails to conform to the contract specifications. As we explained in *On–Line Games,* that principle does not apply to contracts which the Treasury Department awards under a statute that grants it greater discretion by instructing it to determine which proposal will be " 'most advantageous to the State, price *and other factors* considered.' " *Id.* at 591, 653 *A.*2d 1145 (quoting *N.J.S.A.* 52:34–12(f)) (emphasis added).

The regulations here are similar to such statutes in the care they take to state factors beyond price that DPM & C ought to consider in deciding which proposal to recommend. They direct DPM & C to choose the proposal that is "best able to fulfill the space need as defined in the scope of work" in addition to being cost effective. *N.J.A.C.* 17:11–69. They then define a "cost effective" proposal not simply as being the least expensive, but rather as the least expensive alternative "that can be demonstrated to conform to criteria provided by DPM & C in the leased space proposal package and to the operational concerns and

restrictions of the State agency." *N.J.A.C.* 17:11–1.3, 17:11–6.9. DPM & C's authority to choose among conforming proposals on other factors in addition to price, as well as DPM & C's authority under *N.J.A.C.* 17:11–6.11 to reject all proposals after receipt of a challenge, thus invalidates Barrick's argument that DPM & C was compelled to recommend him as the lessor in the absence of an affirmative reason to call his proposal nonconforming. Indeed, they would invalidate that argument even if Barrick's proposal were the only conforming proposal left for DPM & C to consider.

Barrick also argues that the need to readvertise was a pretext for DPM & C to avoid making a choice between the two proposals and having to defend it, but for these same reasons, DPM & C's decision to reject both proposals and to readvertise was permissible under the regulations regardless of Barrick's disappointment with it. A space planning request may be withdrawn at any time. *N.J.A.C.* 17:11–4.3(c), (d). The regulation depicts the withdrawal as being made by the requesting agency rather than by DPM & C, but that difference is immaterial here in light of DPM & C's independent authority under *N.J.A.C.* 17:11–6.11 to retract a notice of intent to recommend after receipt of a challenge and to decide instead not to recommend any proposal. DPM & C's understanding of its legal authority as permitting it to withdraw the space planning request or to reject all proposals, even in the absence of a compelling reason, was thus correct.

Turning to the factual findings that DPM & C used to justify its decision to readvertise, DPM & C found that the final version of DGR's proposal satisfied the Labor Department's parking requirement, that the advertisements were inconsistent in stating the parking requirement, and that the version reciting the requirement as 125 spaces might have discouraged other potential lessors who could have arranged to provide a lower but still adequate number of spaces. There was no evidence to contradict DGR's assertions that the lot located one-half block from its building could accommodate eighty vehicles if it were attended, which moots Barrick's argument that DGR's proposal necessarily relied

on an illegal appropriation of public parking spaces, or to contradict DGR's assertion that it could secure a lease on the municipal lot. The internal DPM & C memos that Barrick cites may have found DGR's parking to be inferior to Barrick's, but they did not find it to be an unacceptable way of meeting the requirement.

Most importantly, there was no way to prove or disprove the existence of other potential lessors who would have responded if they thought the parking requirement was for fewer than 125 spaces. Therefore, there was nothing to undermine the "strong presumption" that DPM & C acted reasonably in deciding that the inconsistency might have wrongly discouraged other eligible potential lessors from responding. *See In re Vey*, 272 *N.J.Super.* 199, 205, 639 *A.*2d 724 (App.Div.1993) (agency enjoys strong presumption that its exercise of statutorily-delegated responsibilities is reasonable), *aff'd*, 135 *N.J.* 306, 639 *A.*2d 718 (1994).

Finally, Barrick fails to present any authority for his alternative claim to impose two conditions on a new advertisement, namely, that it occur within thirty days, presumably from the date of our ruling to such effect, and that it declare the provision of on-site parking to be an ADA requirement. The statute and regulations that he cites do not mention such a deadline or mention on-site parking, much less require either.

Affirmed.