**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2733-21

IN THE MATTER OF
SHANNON TURNER,
MERCER COUNTY
CORRECTION CENTER.

_____

Submitted November 9, 2023 – Decided January 9, 2024

Before Judges Currier and Susswein.

On appeal from the New Jersey Civil Service Commission, Docket No. 2018-3108.

Alterman & Associates, LLC, attorneys for appellant Shannon Turner (Stuart J. Alterman and Timothy J. Prol, on the brief).

Paul R. Adezio, Mercer County Counsel, attorney for respondent Mercer County (Michael Anthony Amantia, Assistant County Counsel, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Nicholas V. Klimowicz, on the statement in lieu of brief).

PER CURIAM

Petitioner Shannon D. Turner appeals from the Civil Service Commission's (Commission) April 6, 2022 Final Administrative Action (Final Order) adopting the initial decision of the Administrative Law Judge (ALJ) that found her guilty of violating provisions of N.J.A.C. 4A:2-2.3(a) and upheld her eight-day suspension. We affirm.

On January 30, 2018, Turner was employed as a Correctional Police Officer at the Mercer County Correction Center (MCCC). At 6:48 p.m., a Code 3 was called on the West Wing Right unit, indicating an altercation between inmates. At 6:50 p.m., a Code 2 was called on the West Wing Left unit, indicating an inmate needed medical attention. The codes were dispatched by radio to all the correction officers and were announced on MCCC's Bogen Box, a public address system that broadcasts messages to all radios and over speakers placed inside and outside the MCCC.

MCCC's Standards and Operating Procedures (SOP) required every officer, including Turner, to respond to codes even when on a break. On this day, when the codes were called, Turner was on an authorized break, sitting in her car in the parking lot and talking to her daughter on the phone. She did not respond to the codes.

MCCC issued a Preliminary Disciplinary Action charging Turner with: Conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); Neglect of duty, N.J.A.C. 4A:2-2.3(a)(7); Other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12) for violations of the SOPs and the Mercer County Public Safety Table of Offenses and Penalties—Correction Center. It suspended her for ten days. After a departmental hearing, MCCC issued a Final Notice of Disciplinary Action (FNDA) sustaining the charges against Turner but reducing her suspension to eight days. After Turner appealed from the FNDA, the matter was transferred to the Office of Administrative Law where an ALJ conducted a hearing and considered testimony from seven witnesses.

Sergeant George Mizsak testified that on January 30, 2018, he was working in Master Control which was located next to the West Wing unit. It was standard procedure to strip search inmates after a Code 3, and Mizsak explained that more female officers were needed to perform the search. Mizsak noticed that Turner was absent, and he called over the radio for her to respond.

Lieutenant Christopher Zegarski was also stationed in Master Control on January 30, 2018. He testified that he, Mizsak, and his Master Control officer called for Turner over the radio and Bogen Box. When she did not respond,

Zegarski asked the outside security officer if they had seen Turner, and then went to look for her.

Zegarski found Turner in her car in the parking lot.  He knocked on her window and asked her why she had not replied to the codes.  Zegarski said Turner "just looked at [him]" and did not answer.  He then told her to report to the building and complete an incident report providing her reasons for not responding to the codes.  He testified that approximately four to six other officers were in the parking lot when the codes were called, and they had responded.  Zegarski also recalled hearing a radio transmission sent by Turner after the codes.

Turner testified that while she was sitting in her car talking to her daughter, Zegarski banged on the passenger's side window.  When he informed her of the codes and unsuccessful attempts to contact her, Turner said she was "startled" and "stuck."  Concerned the codes were ongoing, she explained that she got out of her car and attempted to run into MCCC.  However, Zegarski told her to write an incident report and go home.

Turner stated in the incident report:  "On the above date, I . . . was told to wri[te] a report on why I did not go to a [C]ode 3 and go home[.]  I . . . did not

A-2733-21

4

hear the code being called and was [outside] on break and did not know[.]" Mizsak and Zegarski also wrote incident reports.

During the hearing, several witnesses testified about issues with MCCC's radios and the Bogen Box. They explained the same radios were used for every shift of officers, and they often died. While the radios were supposed to make a sound to indicate a low battery, they did not always do so. As a result, officers would sometimes not know when their radios ran out of battery power. Additionally, some of the radios did not hold a charge, and even if fully charged, would run out of battery quickly. Only one person at a time could speak on the radios and if multiple people spoke simultaneously, their messages were cut off. Sometimes the radios switched settings, and officers would not be able to hear communications from other officers.

The Bogen Box had speakers on the outside of MCCC, but they did not work. Turner described how, because of the issues with the Bogen Box, an officer responding to a code from the parking lot would notify others on their way into MCCC by tapping on the hoods of their cars. Turner did not see any other officer in their car in the parking lot on January 30, 2018, and did not see other officers leaving the parking lot to respond to the codes.

Radio checks were completed at the beginning of each shift to make sure that every officer's radio was functioning. Turner testified, and the radio check indicated, that her radio was functioning at the beginning of her shift on January 30, 2018. Turner stated she did not turn the volume down on her radio while talking to her daughter, and her radio ran out of battery without warning during her shift. She also admitted she did not mention a radio malfunction in her incident report. She stated that when she wrote she did not hear the codes, she meant "the radio didn't transmit, so that means it didn't work and that's [why] I didn't hear it, and due to the fact that I was outside[,] the Bogen Box was only heard inside . . . so both transmissions . . . fail[ed] . . . ."

On March 2, 2022, the ALJ issued an initial decision. He found the witnesses' testimony about the events of January 30, 2018 and the issues with the radios and the Bogen Box were credible. However, he also found there was no evidence that the radios or Bogen Box were malfunctioning on January 30, 2018. The ALJ stated that Turner's contradictory testimony was "self-interested," "unsupported by any documentary evidence or corroborating testimony," and therefore, "unpersuasive." He reasoned that while Turner did not have to "constantly check that her radio was operational during her shift," there was a "reasonable expectation that she should check her radio to ensure

that [it] was working prior to leaving the facility for her break." The ALJ concluded that Turner had violated N.J.A.C. 4A:2-2.3(a)(6), (7), and (12) and affirmed her eight-day suspension. The Commission adopted the ALJ's decision over Turner's exceptions.

On appeal, Turner argues she is not guilty of violating N.J.A.C. 4A:2-2.3(a) because her radio and the Bogen Box were not working properly. She also contends the ALJ did not consider the malfunctioning equipment when he affirmed her eight-day suspension and did not apply progressive discipline properly because he overlooked her clean disciplinary record and July 2020 commendation.

An agency's decision carries "[a] strong presumption of reasonableness." In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993), aff'd, 135 N.J. 306 (1994). The challenging party bears the burden of showing that the agency's decision "is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Saccone v. Bd. of Trs. of the Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

We grant deference to an ALJ's credibility findings if they were "made after due consideration of the witnesses' testimony and demeanor during the hearing." H.K. v. State, Dep't of Hum. Servs., 184 N.J. 367, 384 (2005).

Applying these principles, we see no reason to reverse the Commission's Final Order. Turner did not respond to the codes when they were originally called or after she was specifically summoned over the radio and the Bogen Box. While many of the witnesses testified about general problems with the radios and the Bogen Box, there was no specific evidence presented of problems with Turner's radio or general issues with the radios or the Bogen Box on January 30, 2018.

The only evidence supporting Turner's assertion of a malfunction was her own testimony. That testimony conflicted with the statement she made in the incident report filled out immediately following the incident, in which Turner did not mention any malfunction with her radio. The ALJ found her testimony was "self-interested" and not credible. As the ALJ's credibility and factual findings are supported by the record, his conclusion that Turner was guilty of violating N.J.A.C. 4A:2-2.3(a)(6), (7), and (12) is affirmed. See Saccone, 219 N.J. at 380 (quoting Russo, 206 N.J. at 27).

A-2733-21

8

We next consider Turner's arguments about her suspension. When reviewing an employee's punishment on appeal, the inquiry "is 'whether [the] punishment [was] "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness."'" In re Revocation of the License of Polk, 90 N.J. 550, 578 (1982) (quoting In re Pell v. Bd. of Educ., 313 N.E.2d 321, 327 (N.Y. 1974)).

The Supreme Court first recognized progressive discipline in Town of West New York v. Bock, 38 N.J. 500, 523 (1962). Progressive discipline is a process used to either "ratchet-up" a public employee's punishment if they have "engage[d] in habitual misconduct" or mitigate a public employee's punishment if they "ha[ve] a substantial record . . . that is largely or totally unblemished by significant disciplinary infractions." In re Herrmann, 192 N.J. 19, 30-33 (2007). However, the application of progressive discipline is not mandatory and "has been bypassed" when a public employee has committed "severe misconduct, especially when the[ir] . . . position involves public safety and the misconduct causes risk of harm to persons or property." Id. at 33. Correction officers are held to higher standards than other public employees and "public safety concerns may also bear upon the propriety of the . . . sanction." In re Carter, 191 N.J. 474, 485 (2007).

In his decision, the ALJ acknowledged Turner's clean disciplinary record and stated, "she has been described as a loyal employee who can be relied upon." However, he affirmed her eight-day suspension because of the high standard that correction officers are held to and the seriousness of Turner's misconduct. He concluded that not responding to the codes, "constituted a failure of [Turner's] professional duty in an emergency situation that put her fellow correction[] officers and the inmates in their charge at great risk of harm."

We see no reason to disturb the imposed sanction. Although Turner only had one prior minor disciplinary violation, the seriousness of her misconduct on January 30, 2018 supports her suspension. Turner's failure to respond to two codes while other correction officers responded to an altercation between inmates and an inmate's need for medical attention jeopardized others' physical safety. As a result, we do not find Turner's eight-day suspension "disproportionate" or "shocking to one's sense of fairness." See Polk, 90 N.J. at 578 (quoting Pell, 313 N.E.2d at 327).

Turner has not demonstrated the Commission's Final Order was arbitrary, capricious, or unreasonable. It was supported by the credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2733-21

10