**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3308-15T3

IN THE MATTER OF THE SUSPENSION
OR REVOCATION OF THE LICENSE OF

AMGAD HESSEIN, M.D.
LICENSE NO.: 25MA067650

TO PRACTICE MEDICINE AND SURGERY
IN THE STATE OF NEW JERSEY.

_____

Argued October 9, 2018 – Decided October 18, 2018

Before Judges Sabatino, Haas and Sumners.

On appeal from the State Board of Medical Examiners, Division of Consumer Affairs, Department of Law and Public Safety.

Joseph M. Gorrell argued the cause for appellant Amgad A. Hessein (Brach Eichler, LLC, attorneys; Joseph M. Gorrell, on the briefs).

Doreen A. Hafner, Deputy Attorney General, argued the cause for respondent State Board of Medical Examiners (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Jillian G. Sauchelli, Deputy Attorney General, on the brief).

PER CURIAM

Appellant Amgad Hessein, M.D., appeals from the March 28, 2016 final agency decision of the Board of Medical Examiners revoking his medical license and ordering him to pay $130,000 in penalties and $308,749.53 in costs for, among other things, fraudulent billing practices, multiple acts of gross and repeated negligence related to patient care, and the creation of false and fictitious patient records. We affirm.

I.

The Administrative Law Judge (ALJ) conducted a seventeen-day hearing, and issued a comprehensive eighty-six page initial decision. The history of this litigation and the facts relevant to this appeal are set forth at length in that decision, and in the Board's equally thorough twenty-six page final decision. Therefore, we need only summarize the most salient facts here.

Prior to the Board's revocation of his license, appellant was a Board-certified anesthesiologist specializing in interventional pain management. Appellant was the sole practitioner in Advanced Pain Management Specialists (APMS), which had offices in Newark, Union, Roseland, Belleville, and South Orange. These offices were staffed by various personnel, including appellant's brother, Ashraf Sami, who served as the APMS office manager.

In June 2009, Detective David Nechamkin of the Union County Prosecutor's Office initiated an investigation of appellant and his practice after receiving a complaint from a member of appellant's staff about the theft of insurance payments. The detective testified that he arranged for one of appellant's patients, J.C., to wear a recording device during her August 6, 2009 appointment with appellant. During that visit, appellant administered an injection to address J.C.'s complaints of pain only two minutes and twelve seconds after the examination began. According to appellant's own medical expert, Dr. Alexander Weingarten, appellant should have thoroughly questioned J.C., and performed a comprehensive physical examination, a process that should have taken approximately forty-five minutes, before injecting her. In addition to this breach of medical protocol, appellant prepared a fictitious progress note for J.C. indicating that the required examination had been performed. Detective Nechamkin also learned that appellant charged J.C.'s insurance company for six office visits in April 2009 even though she only visited his office twice that month.

Detective Nechamkin took statements from several other patients, including B.Z., D.C., and E.M. These patients stated they never saw appellant on consecutive days or on Sundays or Mondays when his office was closed.

3

They were required to sign in when they arrived at the office, and almost always signed a consent form prior to receiving their treatment. Three other patients, J.R., T.A., and A.G. provided similar testimony at the hearing. The ALJ found the testimony by the patients who appeared at the hearing to be credible, and corroborative of the written statements provided by the other patients.

After a year-long investigation, Detective Nechamkin obtained arrest and search warrants that the prosecutor's office executed at approximately 9:00 a.m. on November 17, 2010. Detective Nechamkin arrested appellant at his home.[1] Even though appellant had yet been at work, the detective later found a stack of completed bills on the office manager's desk for interventional pain procedures that had allegedly been administered at appellant's Belleville office on that date.

---

[1] On August 3, 2011, a Union County grand jury charged appellant in thirty-eight counts of a seventy-four count indictment with second-degree conspiracy to commit health care fraud, N.J.S.A. 2C:5-2(a)(1); second-degree theft by deception, N.J.S.A. 2C:20-4(a); and thirty-six counts of second-degree health care fraud by a practitioner, N.J.S.A. 2C:21-4.3(a). Appellant's brother was charged in the remaining thirty-six counts. On September 14, 2016, appellant pled guilty pursuant to a plea agreement to one count of second-degree theft by deception and one count of second-degree health care fraud by a practitioner. After denying appellant's motion to withdraw his plea, the judge sentenced appellant to concurrent eight-year terms on the two charges. The judge also ordered appellant to pay restitution in the amount of $235,093.75 and to forfeit $2 million. We recently affirmed appellant's conviction and sentence. State v. Hussein, Docket No. A-1693-16 (App. Div. Oct. 1, 2018).

The ALJ found that appellant "did not perform those services on November 17" and, instead, prepared the bills "in advance of any scheduled office visits."

Two investigators assigned to the Enforcement Bureau of the Division of Consumer Affairs, Gina Galloni and Marianne Nucci, accompanied representatives of the prosecutor's office during the search of the Belleville location. While there, they observed and inventoried approximately 110 packs, bottles, vials, and sheets of expired medications in drawers, cabinets, and a refrigerator commingled with unexpired medicine. The ALJ found that their testimony on this point, which was supported by photographs of the "prodigious number" of outdated medications they discovered, was "irrefutable."

The prosecutor's office copied all of the patient records seized from appellant and gave them to Galloni and Nucci. Galloni reviewed appellant's billing and treatment records for a representative sample of six patients, D.C., B.Z., A.G., J.R., T.A., and J.C. She looked to see if the patients, Medicare, Medicaid, or a private insurance provider had been billed for services where the patient's name did not appear in the scheduler maintained by appellant and his office staff, on consecutive dates, on Sundays or Mondays when the offices were closed, or where the patient had not signed the required consent form. Out of 348 total visits recorded by appellant for these six patients, Galloni found that

175 of those visits were billed when the patient was not on the schedule. Another twenty-eight visits allegedly occurred when the office was closed, and eighty-two more were on consecutive days, which the patients stated did not occur.

After hearing and observing Galloni as she testified, the ALJ concluded that the investigator's "detailed recitation of the methodology she used to review, compare, and organize the data presented to her, reflect[ed] a professional, methodical, thorough[,] and credible process." The ALJ also found that appellant failed to present any "persuasive arguments to question the accuracy of the data assembled by Galloni from patient records, patients statements," and information she received from appellant's billing company.

In so ruling, the ALJ considered, but rejected, the testimony of appellant's witnesses, including Malana Green, who worked as a medical assistant and office manager. Green testified that she signed patients in when they arrived at the office, and usually had them sign a consent form. Sometimes, however, she did not have time to get the consent forms signed, and she did not always stay at the office until the end of the day. Another officer worker, Haitham Sami, who was appellant's nephew, alleged the office was not closed on Sundays and Mondays, even though Galloni testified there was a sign on the door saying that

6

it was. Two patients, L.F. and K.M., claimed that appellant always explained the procedures he would perform during a visit, even if a consent form was not signed.

Appellant did not testify at the hearing, but argued that because he produced "progress notes" for a number of the visits, this meant they actually occurred. The ALJ rejected this claim, finding that any such notes had been fabricated by appellant in an attempt to hide the fact that he was billing for services he never performed.

For the most part, the ALJ concluded that the testimony of these witnesses was not credible. In addition, he found that even if "some bona fide aberrational visits found their way into Galloni's analysis[,]" such as a case where a patient received a service even though they were not on the schedule and did not sign a consent form, the sheer number "of unsupported billings coupled with witness statements and testimony withstands challenge."

Thus, the ALJ found that appellant "billed patients or their insurance compan[ies] for medical services provided on days when the patients were not in the office." The ALJ explained:

> The breadth of the fictitious patient visits and the consequent billing, as well as the patterns, dispel any notion that such billing was inadvertent, accidental or attributable to clerical errors. This is particularly so

when the Progress Notes in question were prepared by [appellant] rather than fabricated by an employee seeking personal gain. The shamelessness of this conduct is evidenced by the discovery of [bills] prepared in advance of the day of [appellant's] arrest for patient visits that had not occurred and would not occur that day.

Turning to issues of medical care, Dolores Gilmore, an office worker responsible for medical billing, testified that appellant had patients sign consent forms before they received treatment, but no one explained anything on the form to the patients. She admitted that appellant directed her to perform physical therapy procedures on patients even though she had none of the required certifications or licenses. Another unlicensed employee, Samirah McDaniel, confirmed Gilmore's account concerning the improper handling of consent forms. She also stated that appellant had her perform unlicensed physical therapy on patients when Gilmore was absent. The ALJ found that Gilmore's and McDaniel's testimony was credible.

The ALJ also found that appellant billed his patients for alcohol and substance abuse counseling that was not provided. Patients with an alcohol or substance abuse issue, who are receiving pain medication, must receive "thirty minutes of face-to-face discussion between the physician and the patient regarding treatment involvement;" and "a physician is also required to document

8

the history taken from the patient and the time spent with the patient; and to justify" the billing. According to T.A.'s and D.C.'s records, appellant charged each patient twenty-eight times for such counseling. Appellant billed A.G. twice. However, they never received this required treatment.

The parties' medical experts, Dr. Jennifer Yanow for the State, and Dr. Weingarten for appellant, reviewed the patient files for five patients. After reviewing their testimony, the ALJ accepted Dr. Yanow's conclusion that appellant continued to give injections to patients even though they were not working to alleviate the patients' complaints of pain. Under these circumstances, the ALJ concluded that appellant "improperly subjected patients . . . to repeated injections as the treatments he administered were clearly not working. When the injections were not working, [appellant] should have referred those patients to a surgeon to explore other options."

The ALJ also credited Dr. Yanow's testimony that appellant performed procedures on some of the patients without preparing a procedure note or an operative report. Dr. Yanow "stressed that an accurate history and physical examination, including labs or imaging when indicated[,] is mandatory for correct diagnosis and subsequent treatment as well as for uncovering potentially dangerous pathology." The ALJ determined that these violations

9

"demonstrate[d] a disturbing pattern, rather than isolated occurrences, of shoddy and potentially dangerous recordkeeping."

The ALJ also found that appellant's failure to explain the consent form to patients prior to performing a procedure was "grossly deficient" and a "gross deviation from the standard of care." In addition, the patient records revealed that appellant "performed procedures where the patient was under conscious sedation without recording vital signs," which the ALJ ruled was "a major deviation" from the standard of care. Just as troubling, appellant did not have an appropriately-licensed staff person record the vital signs or monitor the sedated patient.

The ALJ did accept Dr. Weingarten's opinion that appellant did not violate the standard of care by administering Kenalog, a long-acting steroid, to patients during epidural injections or facet blocks. Dr. Yanow had opined that this medication should not be repeatedly administered to a patient, because it is not "very water-soluble and therefore has a long duration of action." As a result, she believed that Kenalog should not be administered more than once in six weeks. On the other hand, Dr. Weingarten asserted there is no agreement among anesthesiologists as to the ideal timing between, or total number of, epidural injections, and he believed Dr. Yanow was "under-medicating her patients and

A-3308-15T3

not offering sufficient long-term pain relief" to them. Based on this conflicting testimony, the ALJ concluded that there was "no standard of care that appellant violated with regard to the type and dosage, or frequency and total number of [Kenalog] injections given to patients reviewed" by Dr. Yanow and Dr. Weingarten.

Based upon the foregoing, the ALJ determined that appellant's medical license should be revoked. With regard to the billing and record-keeping violations discussed above, the ALJ explained:

> The overwhelming evidence extracted from the medical records of various patients as well as the credited testimony of patients T.A., A.G., and J.R., the statement of J.C. and the corroborating statements of B.Z. and D.C.[ ] supports the findings that [appellant] engaged in a flagrant, extensive, repetitive, systematic, and long-standing pattern and practice of creating fictitious medical records and consequent billings for visits that did not occur such as on consecutive days or on days when there was no signed patient Consent Forms or scheduled appointments. There was consistent testimony from patients who saw [appellant] regularly, who although praising [appellant] for the treatment he provided to them, denied that they saw him on consecutive days despite medical and billing records to the contrary. It is alarming that the plethora of instances of fraud and dishonesty are extracted from but a small sample of [appellant's] patients. The J.C. intercept provides an additional example of fraud where an office visit did, indeed, occur, but where the Progress Note claims a thorough and complex history and examination that actually was much briefer.

The ALJ also found that appellant

> engaged in gross negligence and gross incompetence
> and negligence and incompetence pursuant to N.J.S.A.
> 45:1-21(c) and (d) for: his repeated failure to obtain
> valid informed consent; his failure to provide proper
> monitoring and documentation of monitoring for
> patients under conscious sedation; administering a
> cervical epidural upon a patient taking Plavix; and
> failing to refer patients for alternate treatment after
> prolonged use of his treatments did not bear positive
> results. A physician acts in a grossly negligent manner
> when his conduct is a patently wide departure from the
> accepted standards of care and/or demonstrates a
> conscious, reckless indifference to the risk of harm to
> the patient. In re Heller, 73 N.J. 292 (1977); State v.
> Gooze, 14 N.J. Super. 277, 282 (App. Div. 1981).

Applying that standard, the ALJ concluded:

> The pro forma consent process used by [appellant],
> absent proof that true pre-procedure and post-
> discussion informed consent was otherwise confirmed,
> improperly deprives patients appearing because of pain
> and discomfort from having a real opportunity to weigh
> the consequences of the procedures. It sadly reflects a
> physician with an apparently busy practice who is
> trying to cut corners in order to save time. The failure
> to hire appropriate personnel to monitor patients under
> conscious sedation is inappropriate as the physician,
> himself, should be concentrating on the very delicate
> and precise intervention procedures and not distracted
> by also monitoring vital signs.

In addition to recommending that appellant's medical license be revoked, the ALJ imposed a $50,000 monetary penalty. He also determined that the

12

State's request for costs should be submitted in the first instance to the Board. Both parties filed exceptions to the ALJ's initial decision.

Following oral argument, the Board unanimously adopted the ALJ's findings of fact and conclusions of law, with certain amplifications and modifications. The Board adopted the ALJ's conclusion that appellant had a practice of performing injections without taking an adequate history or performing a physical examination. However, the Board made clear that appellant's actions constituted "a gross deviation from all acceptable medical practices, and create[d] a significant potential for harm to patients." The Board also determined that appellant "committed gross negligence for his repeated administration of steroid-containing injections despite the lack of apparent benefit to the patient."

Relying on the collective medical expertise of its members, the Board rejected the ALJ's conclusion that there was no standard of practice in the field of anesthesiology concerning the administration of repeated Kenalog injections to patients over a short period of time in order to relieve spinal pain. The Board noted that Dr. Yanow "cautioned against the use of Kenalog, a particulate

steroid, in neuraxial procedures."[2]  Dr. Yanow based her opinion on her training

and experience, as well as several medical journal articles she cited during her

testimony.  The Board agreed with Dr. Yanow "that the use of Kenalog in

neuraxial procedures for the cervical spine is contraindicated, especially with

the lack of informed consent" provided by appellant's patients due to his failure

to review the consent forms with them.  Thus, the Board found that appellant's

indiscriminate use of Kenalog constituted gross negligence.

Turning to other examples of improper medical care appellant provided to

his patients, the Board held:

> [The ALJ] found that [appellant] violated several statutes and regulations but did not quantify the level of misconduct.  After careful review of the entire record in this matter, and in our medical expertise, we amplify the Initial Decision and find that the following violations constitute repeated and gross negligence: allowing and billing for unlicensed employees to render physical therapy; performing conscious sedation without an appropriately certified person present and without appropriate written policies and procedures (a "major deviation" . . .); indiscriminate prescribing of opiates to patient J.R. without documentation of medical necessity; and failing to perform and then billing for alcohol and substance abuse counseling. [Appellant's] haphazard and self-serving manner of

---

[2] Neuraxial anesthesia is a type of regional anesthesia that involves the injection of medication in the fatty tissue that surrounds the nerve roots in the spine (also known as an "epidural") or into the fluid that surrounds the spinal cord, also known as a "spinal."

practicing medicine put vulnerable patients at very real risk of harm. [Appellant's] shocking disregard for patient safety and welfare supports our conclusion that [appellant] is a fundamentally corrupt and/or incompetent practitioner.

Based upon the foregoing, the Board adopted the ALJ's recommendation that appellant's medical license be revoked. The Board found that appellant

> systematically and flagrantly ignored Board statutes and regulations, engaged in gross negligence and placed his patients at risk of harm while defrauding payors for years. The ALJ described [appellant's] grossly negligent care of the six patients that were the subject [of] . . . this matter to be representative of [appellant's] general practice. We also accept that these six patients are merely a reflection of [appellant's] pattern of misconduct and gross negligence.

The Board further explained that appellant's

> duty to accurately record his patient's conditions and treatment rendered is not a technicality. [Appellant's] patients do not have a medical record; they have documentation supporting [appellant's] massive, fraudulent billing scheme. Third[-]party[]payors, whether the government through Medicare or Medicaid or private insurers, as well as private persons paying for medical treatment out of pocket, [were] all victimized by false records. [Appellant] has betrayed the trust of his patients, the public, and the regulated community, and has raided the public coffers.

15

Under these circumstances, the Board determined that a $130,000 civil penalty was more appropriate than the $50,000 sanction suggested by the ALJ. The Board stated that it was imposing that penalty because

> the record before us shows that, over a period of three years, [appellant] created false records on a minimum of 132 occasions, allowed unlicensed employees to administer physical therapy modalities which he billed as if they were licensed on at least eight occasions, and improperly subjected at least four patients to repeated injections when the treatments he administered were clearly not working. If we were to count each of these instances as a separate violation[,] we would be justified in imposing a civil penalty in excess of $2 million pursuant to N.J.S.A. 45:1-25.

The Board also reviewed the State's documentation concerning the prosecution costs it incurred, including attorney fees, and ordered appellant to pay the State $308,749.53. This appeal followed.

II.

On appeal, appellant argues that: (1) the Board's decision that appellant "did not provide numerous services flies in the face of clear documentation and reality"; (2) "the Board's finding that the use of Kenalog in [neuraxial] procedures for the cervical spine is contraindicated is not supported by the record"; and (3) the ALJ "demonstrated prejudice against appellant thereby depriving him of due process of law." Based upon our review of the record and

16

applicable law, we conclude that appellant's contentions are without sufficient merit to warrant extensive discussion in a written opinion.  R. 2:11-3(e)(1)(D), (E).  We therefore affirm substantially for the reasons stated by the Board in its comprehensive final decision, which incorporated the findings of fact and conclusions of law set forth in the ALJ's initial decision.  We add the following comments.

Our scope of review of an administrative agency's final determination is limited.  In re Herrmann, 192 N.J. 19, 27 (2007).  A "strong presumption of reasonableness attaches" to the agency's decision.  In re Carroll, 339 N.J. Super. 429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993), aff'd, 135 N.J. 306 (1994)).  The burden is upon the appellant to demonstrate grounds for reversal.  McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002); see also Bowden v. Bayside State Prison, 268 N.J. Super. 301, 304 (App. Div. 1993) (stating that "[t]he burden of showing the agency's action was arbitrary, unreasonable[,] or capricious rests upon the appellant").  To that end, we will "not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence."  In

17

re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008).

It is not our place to second-guess or substitute our judgment for that of the agency and, therefore, we do not "engage in an independent assessment of the evidence as if [we] were the court of first instance." In re Taylor, 158 N.J. 644, 656 (1999) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). Additionally, we give "due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility[,]" and therefore accept their findings of fact "when supported by adequate, substantial and credible evidence[.]" Id. at 656. (first quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965); and then quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)). Applying these principles, we discern no basis for disturbing the Board's well-reasoned determination that appellant submitted numerous fraudulent bills, created fictitious treatment records, and provided "grossly deficient" and "grossly negligent" medical care to patients that constituted a "gross deviation" from the required standard of care.

Appellant first contends that the ALJ should have given more weight to the testimony of his witnesses, specifically Malana Green, who claimed that she was not always present in the office and, therefore, could not be sure whether

all of the patients signed in when they arrived at the office. He also alleges that it made no sense for patients who were in pain to take the time to sign consent forms. Therefore, appellant argues that the ALJ should not have accepted Galloni's testimony that if the patient did not appear on the schedule, sign in upon arrival, or complete the consent form, this meant the visit never occurred and that appellant fraudulently billed for the services he claimed he rendered.

However, appellant's contention on this point ignores the fact that the ALJ, who had the opportunity to observe the witnesses as they testified, credited the testimony of the State's witnesses, and found that the contrary assertions presented by appellant's witnesses were not credible. As stated above, we are required to defer to the credibility determinations made by the trier of fact. Taylor, 158 N.J. at 656. Accordingly, there is ample evidence in the record, including the testimony of the patients, to support the Board's conclusion that appellant billed for services he never provided.

Moreover, even if appellant provided some of the services he could not verify with documentation, he still placed the patients at serious risk of harm by the fact that he did not adequately document their treatment, or obtain the consent necessary to enable the patient to weigh the possible benefits and risks of the proposed treatment and to make an informed choice whether to undergo

it. Therefore, we have no basis for disturbing the Board's determination to revoke appellant's license to practice medicine.

For similar reasons, we reject appellant's argument that the Board should not have concluded that he improperly administered Kenalog during neuraxial procedures of the cervical spine. The overuse of this medication was just one example of the many instances where appellant provided grossly negligent care that warranted the revocation of his license. Among other things, appellant directed unlicensed employees to render physical therapy; performed conscious sedation procedures without having a certified person present to monitor the patient; prescribed opiates to a patient without any documentation that the medication was medically necessary; and failed to perform alcohol and substance abuse counseling when required. These examples of misconduct, and the others noted above, which are not specifically challenged by appellant in his brief, were more than enough to warrant the revocation of appellant's license and the imposition of the monetary penalty and costs without the need to consider appellant's misuse of Kenalog in the treatment of his patients. Thus, any error in the Board's consideration of the Kenalog issue would have been harmless.

A-3308-15T3

That having been said, however, we discern no basis for disturbing the Board's determination to accept Dr. Yanow's expert testimony over that of Dr. Weingarten that there was an established standard of care for the administration of Kenalog in neuraxial cervical spine procedures. Contrary to appellant's contention, Dr. Yanow grounded her opinion in the facts and data she obtained by reviewing the patient files, and she based her determination that appellant improperly used Kenalog on her training, experience, and review of applicable medical journals. Townsend v. Pierre, 221 N.J. 36, 55 (2015) (stating that an expert's testimony does not constitute a net opinion when the expert is "able to identify the factual bases for [his or her] conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable"). In addition, appellant concedes that in assessing the record, the Board is permitted to rely on the expertise of the physicians who comprise the majority of its membership. In re Kerlin, 151 N.J. Super. 179, 185 (App. Div. 1977). Therefore, we affirm the Board's finding that in addition to the many other cases of gross negligence discussed in its decision, appellant also acted improperly by using Kenalog so often, especially where he did not first obtain the informed consent of the patients to this procedure.

21

Finally, appellant argues that the ALJ was biased against him. In support of this claim, appellant points to several evidentiary rulings made by the ALJ during the course of the seventeen-day hearing that went in the State's favor. He alleges that when he attempted to introduce similar evidence, the ALJ ruled against him. This argument lacks merit.

A judge's decision to admit or exclude evidence is "entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment." Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). "Thus, we will reverse an evidentiary ruling only if it 'was so wide [of] the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

In this section of his brief, appellant never specifies how any of the evidentiary rulings made any difference in the ALJ's ultimate conclusions. Indeed, there is no principled analysis of, or citation to governing case law concerning, any of these alleged errors.[3] Instead, appellant's argument is simply

---

[3] Therefore, we are unable to conclude that the ALJ abused his discretion in regard to any of the rulings that are briefly mentioned in appellant's brief.

that because the rulings went against him, it could only have been because the judge was biased against him.

However, "[b]ias cannot be inferred from adverse rulings against a party." Strahan v. Strahan, 402 N.J. Super. 298, 318 (App. Div. 2008) (citing Matthews v. Deane, 196 N.J. Super. 441, 444-47 (Ch. Div. 1984)). Thus, the mere fact that the ALJ made adverse rulings against appellant does not suggest that the ALJ was biased against him. Instead, the record demonstrates that the ALJ was patient with appellant throughout the lengthy proceedings, and made rulings, some in favor of appellant and some that were not, that were fair to both parties and based on the facts developed at the hearing.

We also reject appellant's claim allegation, improperly raised by him for the first time in his reply brief, that the ALJ improperly barred him from testifying at the hearing. See L.J. Zucca, Inc. v. Allen Bros. Wholesale Distribs., Inc., 434 N.J. Super. 60, 87 (App. Div. 2014) (holding that "[a]n appellant may not raise new contentions for the first time in a reply brief"). As appellant is fully aware, he decided to proceed with the administrative hearing even though there were criminal charges pending against him. He then discharged his attorney before the hearing, and represented himself. Because of the pending

criminal charges, appellant advised the ALJ at the beginning of the hearing that he was not going to testify, although he reserved his right to do so.

Thereafter, appellant never asked to testify and the ALJ never prevented him from doing so. However, appellant bases his newly-minted contention on a brief colloquy that occurred on the last day of the hearing, while the Deputy Attorney General (DAG) was cross-examining Dr. Weingarten. Appellant objected to a question, and asserted it was "misleading." The ALJ instructed appellant to let the expert testify, rather than attempting to testify himself in response to the DAG's questions. Appellant then stated that if he were to testify, the DAG was "not going to like what I say." The DAG responded by saying she "would be anxious" to have appellant testify.

After replying that he was "willing to do it by the way[,]" appellant agreed with the ALJ that "that ship has sailed" and was "not going to happen." Appellant then explained his objection, which the ALJ sustained. The DAG rephrased her question to Dr. Weingarten and the hearing concluded later that day.

Under no circumstances could this brief exchange be interpreted as a bona fide request by appellant to testify or an improper refusal by the ALJ of this request. Clearly, appellant would not have been permitted to testify in the

middle of his own expert's testimony. When Dr. Weingarten completed his presentation, however, appellant called no further witnesses, and never sought to testify himself. Appellant never raised this issue before the ALJ in his summation, and did not raise it in the exceptions he filed with the Board. Therefore, we reject appellant's baseless allegation.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3308-15T3